RAILROAD COMPANY v. COUNTY OF OTOE.

1. Unless restrained by a constitutional prohibition of some sort, the legislature of a State may properly authorize a county to aid, by issuing its bonds, and giving them as a donation to a railroad company, the construction of a road outside of the county and even outside of the State, if the purpose of the road be to give to the county a connection which is desirable with some other region.

2. There is no such prohibition on the legislature in the constitution of Nebraska.

3. A legislative act prescribing the mode in which counties shall issue their bonds, is but the act of one legislature; and accordingly a special act giving to a county a right to issue their bonds in disregard of the ordinary legislative provisions, authorizes such last-named sort of issue.

ON certificate of division from the Circuit Court of Nebraska; the case being thus:

An act of the Territorial legislature of Nebraska, approved January 1st, 1861, enacted:

"That the commissioners of any county should have power to submit to the people of any county at any regular or special election, the question whether the county will aid or construct any road; and said commissioners may aid any enterprise designed for the benefit of the county as aforesaid, whenever a majority of the people thereof shall be in favor of the proposition as provided in this section.

"When the question submitted involves the borrowing or expenditure of money, the proposition of the question must be accompanied by a provision to lay a tax for the payment thereof, in addition to the usual taxes under section sixteen of this chap-

---

* Maclae v. Sutherland, 25 English Law and Equity, 114.

ter; and no vote adopting the question proposed shall be valid, unless it likewise adopt the amount of tax to be levied to meet the liability incurred."

This Territorial act being in force, the county clerk of Otoe County, one Bennett, issued the following call:

"In pursuance of the authority in me vested by law, I hereby call a meeting of the commissioners of Otoe County, to be held at their usual place of meeting in Nebraska City, of said county, on Saturday, the 24th day of February, A. D. 1866, to take into consideration the question of submitting to the people of said county the issue of the bonds of said county, not exceeding $200,000 in amount, to be used in procuring to said county an eastern railroad connection.

"ELISHA BENNETT,<br>"County Clerk."

In pursuance of this notice, the county commissioners met and ordered an election to be held on the 17th day of March, 1866. The order for this election was as follows:

"It is ordered that an election be held on the 17th day of March, 1866, in and throughout the county of Otoe, N. T., for the purpose of ascertaining whether the commissioners of Otoe County shall issue bonds not to exceed $200,000, for the purpose of securing an eastern railroad connection for Nebraska City, N. T."

An election was held accordingly, and at it 1362 votes were cast in favor of the said proposition, and 201 votes cast against it.

The Council Bluffs and St. Joseph Railroad Company having built a railroad from Council Bluffs, in Iowa, to St. Joseph in Missouri, near Nebraska City, $40,000 of the bonds of Otoe County, so as aforesaid voted for, were issued to *it;* the said bonds having been issued to secure an eastern railroad connection, and the same having been secured by way of St. Joseph and by way of Council Bluffs.

After this, that is to say, in February, 1867, Nebraska was admitted into the Union; and adopted a constitution of government. That constitution thus ordains:

" The legislative authority of the State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives.

" The property of no person shall be taken for public use without just compensation.

" The credit of the State shall never be given or bound in aid of any individual association or corporation.

" For the purpose of defraying extraordinary expenses the State may contract public debts, but such debts shall never in the aggregate exceed $50,000.

" All powers not herein delegated remain to the people."

This constitution being in force, the legislature of the State of Nebraska, on the 15th of February, 1869, passed "*An act to authorize the county commissioners of Otoe County to issue the bonds of said county to the amount of* $150,000 *to the Burlington and Missouri River Railroad Company, or any other railroad company running east from Nebraska City.*" The Burlington and Missouri River Railroad Company, here named, was a foreign corporation; one incorporated by the State of Iowa. The act of the Nebraska legislature was in these words:

" WHEREAS the qualified electors of the county of Otoe, and State of Nebraska, have heretofore, at an election held for that purpose, authorized the county commissioners of said county to issue the bonds of said county in payment of stock to any railroad in Fremont County, Iowa, that would secure to Nebraska City an eastern railroad connection, to the amount of $200,000; and whereas but $40,000 have been issued.

" SECTION 1. *Therefore, be it enacted.* &c., That said commissioners be, and they are hereby authorized to issue $150,000 of the bonds aforesaid to the Burlington and Missouri River Railroad Company, or any other railroad company that will secure to Nebraska City a direct eastern railroad connection, *as a donation to said railroad company*, on such terms and conditions as may be imposed by said county commissioners.

" SECTION 2. Said bonds, when so issued, are hereby declared to be binding obligations on said county, and to be governed by the terms and conditions of an act entitled ' An act to enable counties, cities, and precincts to borrow money or to issue bonds

to aid in the construction or completion of works of internal improvements in this State, and to legalize bonds already issued for such purpose,' approved February, A. D. 1869."

On the 23d day of July, 1869, the board of county commissioners of Otoe County reciting that the people of the county had voted $200,000 in bonds, in aid of an eastern railroad connection, of which bonds there remained unappropriated over $150,000, passed a resolution to the effect that if the said Burlington and Missouri River Railroad Company would within a limited time named, build a certain road described (which it was stated the company proposed to build, upon the condition that Otoe County " will *donate and give* to said company" $150,000 in the bonds above referred to); and if the said company would equip and work the said road as a through eastern connection, then the county commissioners would issue and deliver to the said railroad company $150,000 of the said bonds theretofore voted by the said county to such eastern connection; the resolution to operate as a contract between the county and the railroad company, if accepted by the latter within a time named. The resolution was accepted by the railroad company. The Burlington and Missouri River Railroad Company within the time built and has ever since worked a railroad such as was contemplated.

In this state of things, on the 23d day of July, 1869, the county commissioners passed a resolution directing the county clerk to deliver to the railroad company the bonds with the coupons attached, which was by him accordingly done on the 27th day of September, 1869. *There was no vote of the people other than that above mentioned authorizing the issue of said bonds to said company.*

The Burlington and Missouri River Railroad Company sold and transferred the said bonds with the coupons attached, for value, and before maturity of any of the coupons, to the Chicago, Quincy, and Burlington Railroad Company, another foreign corporation, to wit, a corporation of Illinois. The coupons as they came due were detached from their

respective bonds, but not being paid, that company sued the county of Otoe in the court below. On the trial the judges were divided in opinion on the two following questions, and the questions were certified and sent here for answers:

*First.* Whether or not the act of February 15th, 1869, authorizing the county to issue bonds in aid of a railroad outside of the State conflicted with the constitution of the State of Nebraska.

*Second.* Whether the county commissioners of Otoe County, under the act of February 15th, 1869, could lawfully issue the bonds from which the coupons in suit were detached, without the proposition to vote the bonds for the purpose indicated, and also a tax to pay the same, being or having been submitted to a vote of the people of the county as provided by the act of the Territorial legislature of Nebraska, approved January 1st, 1861.

*Mr. G. B. Scofield, for the county:*

1. By the constitution of Nebraska all power not delegated to the legislature remains with the people. For defraying *extraordinary* expenses, the State may contract a debt not exceeding $50,000. Building a railroad is not an extraordinary occasion; nor was the limit here observed.

2. The constitution of Nebraska ordains that "the property of no person shall be taken for public use without just compensation." Now persons may be properly taxed for the public benefit; that is to say, for the benefit of all. Private property, indeed, is then taken, but a compensation is received. When, however, their property is taken for the benefit of a *private corporation*, as in this case, it is taken without compensation. Certainly the property taken here by tax is, in view of the purpose to which it is applied, taken without any due process of law.

3. But if the preceding propositions were questionable, it seems unquestionable that no legislature can take one man's property to make a present of it—to give it by way of donation—to another man, or to a private corporation, which is but an aggregation of men. This has been judicially de-

cided by respectable courts.* Still less, if possible, can the legislature delegate to the small political divisions which exist under the names of counties, townships, cities, boroughs, &c., a power of this dangerous kind. The objects for which these small political divisions are brought into existence are quite different.

4. Finally, and above all, the railroad to be aided is wholly outside, not only of the county of Otoe, but of the State of Nebraska. It is a foreign corporation. No benefits local and peculiar arise to the county of Otoe from this railroad. The people of the county have no right to use it, except as all people everywhere have; that is to say, on paying for its use. Even the advantages set up as a justification for the tax are of a speculative kind.

*Mr. J. M. Woolworth, contra.*

Mr. Justice STRONG delivered the opinion of the court.

The first question upon which the judges of the Circuit Court divided was whether the act of the legislature of Nebraska, approved February 15th, 1869, authorizing the county of Otoe to issue bonds in aid of a railroad outside of the State, conflicts with the constitution of that State.

Unless we close our eyes to what has again and again been decided by this court, and by the highest courts of most of the States, it would be difficult to discover any sufficient reason for holding that this act was transgressive of the power vested by the constitution of the State in the legislature. That the legislative power of the State has been conferred generally upon the legislature is not denied, and that all such power may be exercised by that body, except so far as it is expressly withheld, is a proposition which admits of no doubt. It is true that, in construing the Federal Constitution, Congress must be held to have only those powers which are granted expressly or by necessary implication, but the opposite rule is the one to be applied to the

---

* Whiting *v.* Sheboygan Railway Company, 9 American Law Register, 156; Sweet *v.* Hurlburt, 51 Barbour, 318.

construction of a State constitution.   The legislature of a
State may exercise all powers which are properly legislative,
unless they are forbidden by the State or National Constitu-
tion.   This is a principle that has never been called in ques-
tion.   If, then, the act we are considering was legislative in
its character, it is incumbent upon those who deny its valid-
ity to show some prohibition in the constitution of the State
against such legislation.   And that it was an exercise of leg-
islative power is not difficult to maintain.   No one questions
that the establishment and maintenance of highways, and
the opening facilities for access to markets, are within the
province of every State legislature upon which has been
conferred general legislative power.   These things are nec-
essarily done by law.   The State may establish highways or
avenues to markets by its own direct action, or it may em-
power or direct one of its municipal divisions to establish
them, or to assist in their construction.   Indeed, it has been
by such action that most of the highways of the country
have come into existence.   They owe their being either to
some general enactment of a State legislature or to some
law that authorized a municipal division of the State to con-
struct and maintain them at its own expense.   They are the
creatures of law, whether they are common county or town-
ship roads, or turnpikes, or canals, or railways.   And that
authority given to a municipal corporation to aid in the con-
struction of a turnpike, canal, or railroad is a legitimate ex-
ercise of legislative power, unless the power be expressly
denied, is not only plain in reason, but it is established by a
number and weight of authorities beyond what can be ad-
duced in support of almost any other legal proposition.   The
highest courts of the States have affirmed it in nearly a
hundred decisions, and this court has asserted the same
doctrine nearly a score of times.   It is no longer open to
debate.

Then what is there in the constitution of the State of Ne-
braska which denies this power to the legislature?   There
is no direct or express prohibition.   General legislative
power is vested in the legislature.   None was reserved to

the people of the State. There are, however, certain restrictions that may be noticed. The constitution declares that " the property of no person shall be taken for public use without just compensation," and it is earnestly contended that this prohibits the legislature from passing any laws in aid of the construction of a railroad that may result in the imposition of taxes. It is said that the act of February.15th, 1869, is taking private property for a public use without compensation. It would be a sufficient answer to this to say that a similar provision is found in the constitution of almost every State, the legislature of which has been held authorized to legalize municipal subscriptions in aid of railroad companies. It has never been held to prohibit such legislation as we are now considering. But the clause prohibiting taking private property for public use without just compensation has no reference to taxation. If it has, then all taxation is forbidden, for " just compensation" means pecuniary recompense to the person whose property is taken equivalent in value to the property. If a county is authorized to build a court-house or a jail, and to impose taxes to defray the cost, private property is as truly taken for public use without compensation as it is when the county is authorized to build a railroad or a turnpike, or to aid in the construction and to levy taxes for the expenditure. But it is taken in neither case in the constitutional sense. The restriction is upon the right of eminent domain, not upon the right of taxation.

We find nothing else in the constitution of the State that can with any reason be claimed to restrain the power of the legislature to authorize municipal aid to railroads, or other highways. There is a clause that declares " the credit of the State shall never be given to, or bound in aid of any individual association or corporation," and another that ordains that the debts of the State shall never, in the aggregate, exceed $50,000, but these refer only to State action and State liability.*

---

* Patterson *v.* Board of Supervisors of Yuba, 13 California, 175.

In view, therefore, of the organic law of the State, and of the decisions which have been made in regard to other similar constitutional provisions, both in the highest courts of the States and in this court, we think it cannot be doubted the legislature of Nebraska had authority to authorize its municipal divisions to incur indebtedness and to impose taxation in aid of railroad companies.

It is urged, however, against the validity of the act now under consideration that it authorized a donation of the county bonds to the railroad company, and it is insisted that if even the legislature could empower the county to subscribe to the stock of such a corporation, it could not constitutionally authorize a donation. Yet there is no solid ground of distinction between a subscription to stock and an appropriation of money or credit. Both are for the purpose of aiding in the construction of the road; both are aimed at the same object, securing a public advantage, obtaining a highway or an avenue to the markets of the country; both may be equally burdensome to the taxpayers of the county. The stock subscribed for may be worthless, and known to be so. That the legislature of the State might have granted aid directly to any railroad company by actual donation of money from its treasury will not be controverted. No one questions that in the absence of some constitutional inhibition the power of a State to appropriate its money, however raised, is limited only by the sense of justice and by the sound discretion of its legislature. If the power to tax be unrestricted, the power to appropriate the taxes is necessarily equally so. Accordingly nothing has been more common in the State and Federal governments than appropriations of public money raised by taxation to objects, in regard to which no legal liability has existed. State legislatures have made donations for numerous purposes, wherever, in their judgment, the public well-being required them, and the right to make such gifts has never been seriously questioned. As has been said, the security against abuse of power by a legislature in this direction is found in the wisdom and sense of propriety of its members,

and in their responsibility to their constituents. But if a State can directly levy taxes to make donations to improvement companies, or to other objects which, in the judgment of its legislature, it may be well to aid, it will be found difficult to maintain that it may not confer upon its municipal divisions power to do the same thing. Counties, cities, and towns exist only for the convenient administration of the government. Such organizations are instruments of the State, created to carry out its will. When they are authorized or directed to levy a tax, or to appropriate its proceeds, the State through them is doing indirectly what it might do directly. It is true the burden of the duty may thus rest upon only a single political division, but the legislature has undoubted power to apportion a public burden among all the taxpayers of the State, or among those of a particular section. In its judgment, those of a single section may reap the principal benefit from a proposed expenditure, as from the construction of a road, a bridge, an almshouse, or a hospital. It is not unjust, therefore, that they should alone bear the burden. This subject has been so often discussed, and the principles we have asserted have been so thoroughly vindicated, that it seems to be needless to say more, or even to refer at large to the decisions. A few only are cited.*

One other objection to the constitutionality of the act is urged. It is that it authorized aid to a railroad beyond the limits of the county, and outside the State. There is nothing in this objection. It was for the legislature to determine whether the object to be aided was one in which the people of the State had an interest, and it is very obvious that the interests of the people of Otoe County may have been more involved in the construction of a road giving them a connection with an eastern market than they could be in the construction of any road wholly within the county.

---

* Blanding *v.* Burr, 13 California, 343; The Town of Guilford *v.* The Supervisors of Chenango County, 3 Kernan, 149; Stuart *v.* Supervisors, 30 Iowa, 9; Augusta Bank *v.* Augusta, 49 Maine, 507; Railroad Co. *v.* Smith, a case decided by the Supreme Court of Illinois and not reported.

But that the objection has no weight may be seen in *Gelpcke* v. *Dubuque*,* and in *Walker* v. *Cincinnati*.†

We conclude, therefore, that the act of the legislature of February 15th, 1869, is not in conflict with the constitution of the State.

The second question upon which the Circuit Court divided was "whether the county commissioners of Otoe County could, under the act of February 15th, 1869, lawfully issue the bonds from which the coupons in suit were detached, without the proposition to vote the bonds for the purpose indicated, and also a tax to pay the same being or having been submitted to a vote of the people of the county, as provided by the act of the Territorial legislature of Nebraska, passed January 1st, 1861."

This question we answer in the affirmative. If the legislature had power to authorize the county officers to extend aid on behalf of the county or State to a railroad company, as we have seen it had, very plainly it could prescribe the mode in which such aid might be extended, as well as the terms and conditions of the extension, and it needed no assistance from a popular vote of the municipality. Such a vote could not have enlarged legislative power. But the act of 1869 was an unconditional bestowal of authority upon the county commissioners to issue the bonds to the railroad company. It required no precedent action of the voters of the county. It assumed that their assent had been obtained. That prior to 1869 the sanction of approval by a local popular vote had been required for municipal aid to railroad companies, or improvement companies, is quite immaterial. The requisition was but the act of an annual legislature which any subsequent legislature could abrogate or annul.

It must, therefore, be certified to the Circuit Court, *first*, that the act of February 15th, 1869, is not unconstitutional; and, *second*, that the county commissioners of Otoe County could lawfully issue the bonds from which the coupons in suit were detached, without any submission to a vote of the

---

* 1 Wallace, 175.                                    † 21 Ohio, 14.

people of the county of the proposition to approve the bonds, or a tax for the payment thereof.

CERTIFIED ACCORDINGLY.

The CHIEF JUSTICE, Mr. Justice MILLER, and Mr. Justice DAVIS dissented from the opinion in this case.