## TAYLOR *v.* YPSILANTI.

1. Under a statute of Michigan of March 22, 1869, authorizing cities to pled their aid, "by loan or donation, with or without conditions," in the construction of any railroad by a company organized under the laws of the State, the electors of a city voted to issue its bonds to aid such a company upon certain conditions, touching the eastern terminus of the road, and providing that if any citizen should subscribe and pay for stock in the company the latter should deliver him such bonds therefor, and that the citizens should, within thirty days, have the right to subscribe for the stock to the amount of aid voted. The bonds were delivered to the company. *Held,* that the conditions were not unauthorized by the statute, and constitute no defence to an action on the bonds.

2. The court adheres to the ruling in *Township of Pine Grove* v. *Talcott* (19 Wall. 666), and measures the rights and obligations of the parties under the statute in question, as it was there enforced, and as it was acted upon by all the departments of the State government at and before the time when the company earned the bonds by the performance of the prescribed conditions. The court, therefore, declines to accept the subsequent adjudications of the Supreme Court of Michigan, declaring the statute to be repugnant to the Constitution of the State.

3. The courts of the United States, in cases within their jurisdiction involving contract obligations and rights depending upon the laws of the State, will conform to the settled construction which the highest court of the State gave to those laws at the time when the rights accrued or the obligations were incurred.

ERROR to the Circuit Court of the United States for the Eastern District of Michigan.

The case is stated in the opinion of the court.

*Mr. George F. Edmunds* and *Mr. Elijah Meddaugh* for the plaintiff in error.

*Mr. Hiram J. Beakes* for the defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action was brought by Taylor, a citizen of New York, to recover from the city of Ypsilanti, a municipal corporation of Michigan, the amount of certain coupons cut from bonds issued by that city in aid of the construction of the Detroit, Hillsdale, and Indiana Railroad. At the conclusion of the evidence, the jury, being so instructed, returned a verdict in behalf of the city, upon which judgment was entered.

The bonds purport to have been issued under the authority of a general statute, approved March 22, 1869, declaring it to be lawful, within prescribed limits as to amount, for any city or township — a majority of its electors voting, at a meeting called for that purpose, assenting — to pledge its aid, "by loan or donation, with or without conditions," in the construction of any railroad by a corporation organized under the laws of Michigan. The electors voted aid to the extent of $50,000 in bonds of the city, upon condition that the company should have and continue the eastern terminus of its road in the city, or connect, within its limits, with the Michigan Central Railroad; and upon the further condition, that if any citizen of Ypsilanti should subscribe and pay for any share in the stock of the company, the latter " shall deliver to the persons so subscribing and paying for such share the bond or bonds of said city equal to the amount so subscribed and paid for, not exceeding in all the amount of bonds issued by said city to said railroad company; and that citizens of said city shall have the right to subscribe to the stock of said railroad company to an amount not exceeding $50,000 for thirty days after such aid shall have been voted." Upon each bond appears a declaration, under the official signature of the mayor and clerk of the city, setting forth the conditions attached by the popular vote to the issue and delivery of the bonds.

In support of the judgment, it is contended that the city, in giving aid to the construction of a railroad, was restricted to the specific modes — loan or donation — designated in the statute; that this transaction was neither a loan nor a donation; that it is essential to a donation that it should not be made for a valuable consideration, or in execution of a contract embracing reciprocal obligations, since, in a legal sense, it implies an act by which the owner of a thing voluntarily transfers the title and possession of the same from himself to another person without any consideration; and, consequently, the city was without power to issue bonds upon conditions such as those imposed by the electors. It is argued that the conditions are inconsistent with any correct idea of donation, and that the bonds based thereon are unauthorized by law, and therefore invalid as obligations of the city.

In this conclusion we are unable to concur. The argument of counsel fails to give proper effect to material portions of the statute. Power was conferred, not simply to make a loan or donation, but to make a loan or donation "with or without conditions." The statute is silent as to the nature of the conditions with which the loan or donation might be accompanied. It was, in our opinion, a legitimate exertion of that power to secure, in connection with a corporate donation, such advantages. or special privileges for the people of the municipality, not inconsistent with public policy, as the railroad company was willing to concede. The requirement that the company should have and continue the eastern terminus of its road in the city, or connect, within its limits, with the Michigan Central Railroad, inured to the benefit of the mass of the population interested in the growth and prosperity of the city; while the stipulation that citizens of Ypsilanti should be entitled, for a limited period, — thirty days, — to receive the city s bonds to an amount equal to the stock they might subscribe and pay for (not exceeding the amount of the bonds donated), was of value to such persons only as chose to avail themselves of the privilege thus secured. If the transaction has any element of bounty to individual citizens, and was not, for that reason, a donation, within the technical meaning of that word, it is quite sufficient to say that it is within the express statutory authority to attach conditions to any donation which the people might sanction. We are, therefore, of opinion that the donation by the city of its bonds, upon the condition prescribed by popular vote, was within the terms of the statute.

This brings us to the consideration of the proposition advanced in behalf of the city, that the act of March 22, 1869, is repugnant to the Constitution of Michigan, as expounded by its highest judicial tribunal, in *People* v. *Salem*, 20 Mich. 452; *Bay City* v. *State Treasurer*, 23 id. 499, and subsequent cases. These adjudications, it is claimed, constitute the law of this case, and should be followed, as of obligation, without reference to the time when they were made, or to any opinion we may entertain as to the soundness of the principles announced.

The specific provisions which, it is supposed, establish the

invalidity of the act in question are sections six, eight, and nine of article fourteen, and section thirty-two of article six. They declare that " the credit of the State shall not be granted to, or in aid of, any person, association, or corporation;" that " the State shall not subscribe to, or be interested in, the stock of any company, association, or corporation.;" that " the State shall not be a party to, or interested in, any work of internal improvement, nor engaged in carrying on any such work, except in the expenditure of grants to the State of land or other property;" and that . " no person shall be . . . deprived of life, liberty, or property without due process of law." These sections constitute a part of the Constitution of 1850, which is still the fundamental law of the State.

It is not to be questioned that the Supreme Court of Michigan, in the cases cited, has ruled that it was beyond the constitutional power of the legislature to grant to a municipal corporation authority to pledge its credit, or issue bonds, in aid of the construction of railroads by corporations organized, owned, and managed by private persons. Before examining the particular grounds upon which those decisions rest, it is necessary that we should ascertain what was, at the date of the passage of the act of March 22, 1869, the law of Michigan, declared and acted upon by the several departments of its government, upon the general subject of the relations between railroad corporations and the public. The earliest case, to which our attention has been called, is *Swan* v. *Williams*, 2 Mich. 427. It was determined in 1852. The constitutional validity of an act incorporating a railroad company, in so far as it authorized the appropriation of private property for the location, construction, and operation of the road authorized by its charter, was there assailed chiefly upon the ground that property, so appropriated, is in no sense taken for public purposes, but for the private profit and advantage of the corporators. But the court declined to accede to that view. It held that counties, towns, cities, and villages are political or municipal corporations which, from their nature, are subject to the unlimited control of the legislature ; that corporations such as banking, insurance, manufacturing, and trading companies were private corporations, the private advantage of the corporators being the ulti-

mate as well as the immediate object of their creation, and the
resulting benefits to the public being merely incidental; and
that turnpike, bridge, canal, and railroad companies are more
properly styled public corporations, since, in their creation,
public duties and public interests are involved, the discharge of
those duties and the attainment of those interests being the
primary object to be worked out through the powers delegated
to them.    The very existence of the latter, said the court, was
based as well upon the delegation to them of the sovereign
power to take private property for public use, as upon the con-
tinued exercise of that power in the use of property for the
purposes for which it was condemned; that such corporations
are the means employed to carry into execution a given power;
that the character of a corporation is determined, not so much
by the object sought by it, as by that designed by the legisla-
ture; that if that object be the public interest, to be secured
by the exercise of powers, delegated for that purpose, which
would otherwise repose in the State, the corporation is public,
although private interests may be incidentally promoted; that
such a corporation is essentially " the trustee of the govern-
ment for the promotion of the objects desired, a mere agent to
which authority is delegated to work out the public interest
through the means provided for that purpose and broadly dis-
tinguished from one created for the attainment of no public end,
and from which no benefit accrues to the community except
such as results incidentally, and not necessarily, from its opera-
tions."    That there might be no doubt as to the scope of the
decision, Martin, J., speaking for the whole court, further said:
" Nor can it be said that the property when taken is not used
by the public, but by the corporators for their own profit and
advantage.    It is unquestionably true that these enterprises
may be, and probably always are, undertaken with a view to
private emolument on the part of the corporators; but it is
nevertheless true that the object of the government in creating
them is public utility, and that private benefit, instead of being
the occasion of the grant, is but the reward springing from the
services.    If this be not the correct view, then we confess we
are unable to find any authority in the government to accom-
plish any work of public utility through any private medium, or

by delegated authority; yet all past history tells us that governments have more frequently effected these purposes through the aid of companies and corporations than by their immediate agents, and all experience tells us that this is the most wise and economical method of securing these improvements. . ...
The purpose designed by the government in the construction of these roads is the *use* of the public, the expeditious communication from point to point, and not revenue."

In 1859 the legislature of Michigan passed an act providing for the payment from the State treasury of a certain sum, by way of bounty, for every bushel of salt manufactured by any individual, company, or corporation, from water obtained by boring in Michigan, and exempting from taxation property used for such purposes. Laws Mich., 1859, p. 551. That law was subsequently amended, and in *People* v. *State Auditors* (9 Mich. 327), decided in 1861, it was held that the relators, a manufacturing company, acquired a vested right to the amount, offered by the original act, for all salt manufactured prior to the amendatory statute reducing the bounty. And the doctrines of that case were reaffirmed in *East Saginaw Manuf. Co.* v. *City of East Saginaw, &c.* (19 id. 259), decided in 1869, after the passage of the act of March 22, 1869.

The diligence of counsel, aided by our own researches, has not disclosed any adjudication of the Supreme Court of Michigan, prior to May 26, 1870, in which the doctrines of these cases were recalled or, in any degree, modified, — doctrines constituting, as will not be denied, the foundation upon which, in the courts of this country, rests the power of the legislature, when unrestrained by constitutional inhibitions, to authorize municipal aid to railroad enterprises.

So far as the action of the legislative and executive departments of Michigan is concerned, we find that from the adoption of the Constitution of 1850 down to the passage of the act in question, authority was given, in many instances, to municipal corporations to aid in the construction of railroads and plank-roads by corporations organized and managed by private persons. And by a general statute passed in 1855, providing for the incorporation of railroad companies, authority was given

to condemn real estate, property, and franchises for the purposes of the corporation, making compensation therefor in the mode prescribed. That statute expressly declares that "all real estate or property whatsoever, acquired by any company, under and in pursuance of this act, for the purpose of its incorporation, shall be deemed to be acquired for public use." Compiled Laws of Mich., 1857, vol. i. pp. 638, 643. It was in force when the act of March 22, 1869, was passed. But this is not all. In the year 1867 a convention was held, charged with the duty of revising the Constitution of the State. The delegates in that body were of course aware of the existence of numerous statutes, public and private, authorizing railroad corporations to condemn private property for the purpose of constructing and maintaining railroads, and empowering municipal corporations of the State to pledge their credit in aid of their construction. If such legislation was in opposition to the will of the people, or if it was deemed to be forbidden by the letter or spirit of the existing constitution, to remodel which was the object of the convention, we should expect to find in the new constitution some distinct provision reversing the policy which had been steadily pursued by the legislative and executive departments of the State, and which had been sustained as constitutional by the judiciary. But no such provision was adopted. On the contrary, two sections were adopted, relating to the subject of municipal aid to railroads, one declaring that "the legislature shall not authorize any city or township to pledge its credit, for the purpose of aiding in the construction of any railroad to such an extent that the outstanding indebtedness, exclusive of interest, on account of aid to any and all railroads, shall exceed ten per cent of the assessed valuation of such city or township;" while the other affirmatively declared that the legislature might authorize any city or township to raise money by taxation, for such purposes, within the amount named. Although the constitution submitted by the convention of 1867 was not adopted by the people, the sections, to which we have referred, adopted by delegates representing every portion of the State, show that there was no purpose to take from the legislature the power, under all circumstances, of authorizing municipal aid to railroad corpora-

tions. The effort was only to restrict the power theretofore exercised by the legislature.

The act of March 22, 1869, contains no clause of an unusual character. It is general in its application to all the townships, villages, and cities of the State. It requires all bonds executed under its provisions to be delivered to the State treasurer, to be by him held, as trustee for the municipality and the railroad company, until all the conditions prescribed by popular vote or by the statute were performed. It declares that the railroad company for which the bonds were voted shall be entitled to receive them whenever the governor certified that all conditions have been performed. The bonds having been deposited with the State treasurer, the company entered upon the work of construction in the winter of 1869–70. The road was completed prior to Jan. 1, 1871, and has been in operation ever since. But prior to May 26, 1870, it had been so far constructed that the railroad company became entitled under its contract to the bonds voted by the city of Ypsilanti. And on the 10th of June, 1870, the governor gave his certificate under the State seal, stating that the company had performed all conditions prescribed by the statute, and by the vote of the people, and was entitled to receive the bonds voted by the city. On the 21st of June, 1870, the treasurer delivered them to the company, indorsing upon each that it was delivered by him, on that day, under the provisions of the act of March 22, 1869. Thus the city and the railroad company received all for which they respectively bargained.

On the twenty-sixth day of May, 1870, — after, let it be observed, the railroad company had earned the bonds under its contract with the city, and was entitled to the required certificate from the governor, — the case of *People* v. *Salem* was determined in the Supreme Court of the State. It involved the constitutional validity of an act passed in 1864, authorizing certain townships to pledge their credit, and the county of Livingston to raise by tax a loan of money, in aid of the construction of a railroad. The court, Graves, J., dissenting, held the act to be unconstitutional. The point was distinctly made in argument that municipal aid to railroads was prohibited by sects. 6, 8, and 9 of art. 14 of the State Constitution. It was

claimed that those sections would be rendered nugatory if so construed as to recognize the power of the legislature to authorize, or compel, each city. and township in the State to. grant or loan its credit to, or subscribe to the stock of, railroad or other companies, to the amount of a fixed or uniform percentage of the assessed valuation of its taxable property. But the court did not rest its decision upon any specific provision of the State Constitution. Its conclusion was placed upon what were declared to be fundamental maxims of all taxation. It held the exercise, by a municipal corporation, of the power to pledge its credit to be an incipient step in the exercise of taxation; that it is essential to a valid exercise of the power of taxation that it be for a public purpose; that a corporation created for the purpose of constructing a railway, to be owned and operated by the corporators, is a private corporation; that taxation for such a purpose is no more for a public purpose than would be taxation in behalf of the proprietors of a mill, or hotel, or newspaper establishment, or other similar enterprise, which, while private in its nature, supplied a public need. The conclusion of the court was distinctly placed upon general principles, and not upon grounds of local law or upon any special provision of the State Constitution, as is manifest from the last paragraph in the leading opinion, in these words : " As, therefore, it appears that the first and most fundamental maxim of taxation is violated by the act in question, it becomes superfluous to consider whether the act would also violate the maxim of apportionment, or be obnoxious in its application, because the burden, even if public, could not also be regarded as local and peculiar to this township. Equally superfluous is it to consider in detail the several express provisions of the State Constitution which the respondents suppose to be violated. If the authority exercised is not within the taxing power of the State, it is quite needless to discuss whether, if it were within it, there are not restrictions which prohibit its exercise." The conclusion in that case, as thereafter declared in *Bay City* v. *State Treasurer*, struck at the root of all legislation in aid of railroad companies.

We remark in passing that the doctrines of *People* v. *Salem* were, when announced, in direct conflict with those previously

promulgated as well by this court, as by the highest courts of a large majority of the States. It was said by Mr. Justice Clifford, speaking for the court, in *Rogers* v. *Burlington* (3 Wall. 654), decided in 1865, that the rule that the legislature, in the absence of constitutional prohibitions, could authorize municipalities to aid in the construction of railways, owned and managed by private corporations, pervaded the jurisprudence of the United States. We will not, at this late day, enter upon the vindication of that rule. And we may add, that, under the later doctrines announced by the Supreme Court of Michigan, it is difficult to perceive how railroads can be regarded as public highways, subject, in the interest of the public, to governmental control and regulation.

Subsequently, in *Bay City* v. *State Treasurer*, the Supreme Court of Michigan reaffirmed the doctrines of *People* v. *Salem*. In that case, however, the invalidity of municipal aid and taxation for the construction of railroads by railroad corporations was apparently placed upon these additional grounds: 1. That such taxation, being inadmissible under the fundamental principles announced in *People* v. *Salem*, was to be deemed unlawful confiscation, and, therefore, inhibited by sect. 32 of art. 6 of the State Constitution, protecting all persons against deprivation of property without due process of law; 2. That taxation for such purposes was also in violation of sects. 6, 8, and 9 of art. 14 of the State Constitution. It is unnecessary to notice the declarations of the State court in subsequent cases, since they are in line with those made in the two to which we have referred.

In January, 1872, *Talcott* v. *Township of Pine Grove* was determined in favor of the plaintiff in the Circuit Court of the United States for the Western District of Michigan. The question there was as to the constitutional validity of the identical act of March 22, 1869, under the authority of which the bonds in suit were issued. That court, the circuit and district judges concurring, declined to follow the case of *People* v. *Salem*, upon the ground, among others, that the act was valid as well under the laws of Michigan, declared and acted upon by all the departments of the State government at the time of its passage, as under the principles announced in this court

and in the highest courts of most of the States. Upon writ of error the judgment was affirmed in this court at its October Term, 1873. *Township of Pine Grove* v. *Talcott,* 19 Wall. 666. In the argument here attention was called to the decisions in *People* v. *Salem* and *Bay City* v. *State Treasurer,* and it was earnestly contended to be the duty of the courts of the Union to accept the declarations of the State court as to the want of power in municipal corporations of Michigan to pledge their credit or aid in the construction of railroads by corporations owned and managed by private persons. After adverting to the principle that a statute was not to be pronounced void unless the repugnancy to the Constitution be clear and the conclusion that it exists inevitable, this court, speaking by Mr. Justice Swayne, affirmed the judgment, holding the act to be consistent with the Constitution of Michigan. *Railroad Company* v. *County of Otoe,* 16 Wall. 667; *Olcott* v. *The Supervisors,* id. 678. Under the circumstances, it was said that we could not yield to the authority of the decisions of the State court without abdicating the performance of one of the most important duties with which this tribunal is charged.

Of the bonds here in suit, Taylor became the purchaser, for a valuable consideration, in the year 1877. He was aware, at the time of his purchase, of the before-mentioned decisions of the Supreme Court of Michigan, adjudging municipal aid to railroad corporations to be forbidden by law, and bonds issued therefor to be invalid. But it is to be presumed he was also aware that this court, affirming the judgment of the Circuit Court of the United States, sitting in that State, had, at a subsequent period, and long before his purchase, distinctly refused to follow the later decisions of the State court, and had adjudged the act of March 22, 1869, to be in conformity with the fundamental law of Michigan. The present case then appears to be this: Testing the rights and obligations of the parties by the law of the State as declared by this court, and as declared and acted upon by all the departments of the State government, at and before the time when the railroad company entered upon the execution of its contract with the city, we should be obliged to reverse the judgment of the court below;

whereas, if we accept the decision of the Supreme Court of Michigan, made after those rights accrued and after the railroad company had earned the bonds, as conclusive evidence of the constitutional invalidity of the act of March 22, 1869, the judgment must be affirmed.

The position taken by counsel for the city is that the established settled construction, given by the highest court of a State, of the laws and Constitution of that State, must be deemed, in all cases, binding upon the courts of the Union; this, because the statute defining and regulating the jurisdiction of the Federal courts declares that the laws of the several States, when they apply, shall constitute rules of decision in cases at common law tried in those courts. This proposition, in the general terms in which it is announced, is undoubtedly supported by the language of some of the opinions which have emanated from this court. But all along through the reports of our decisions are to be found adjudications in which, upon the fullest consideration, it has been held to be the duty of the Federal courts, in all cases within their jurisdiction, depending upon local law, to administer that law, so far as it affects contract obligations and rights, as it was judicially declared to be by the highest court of the State at the time such obligations were incurred or such rights accrued. And this doctrine is no longer open to question in this court. It has been recognized for more than a quarter of a century as an established exception to the general rule that the Federal courts will accept or adopt the construction which the State courts give to their own Constitution and laws. "The sound and true rule," said Mr. Chief Justice Taney, in *Ohio Life Ins. Co.* v. *Debolt* (16 How. 416, 432), "is that if the contract when made is valid by the laws of the State, as then expounded by all the departments of its government, and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent act of the legislature of the State, or decision of its courts, altering the construction of the law." So in *The City* v. *Lamson* (9 Wall. 477, 485), Mr. Justice Nelson, speaking for the court, said: "It is urged, also, that the Supreme Court of Wisconsin has held that the act of the legislature conferring authority upon the city to lend its credit, and issue the bonds in question, was

in violation of the provisions of the Constitution above referred to. But at the time this loan was made and these bonds were issued, the decisions of the courts of the State favored the validity of the law. The last decision cannot, therefore, be followed."

Again, in *Olcott* v. *The Supervisors* (*supra*), the court, speaking through Mr. Justice Strong, said: "This court has always ruled that if a contract when made was valid under the constitution and laws of a State, as they had been previously expounded by its judicial tribunals, and as they were understood at the time, no subsequent action by the legislature, or the judiciary, will be regarded by this court as establishing its invalidity." To the like effect are some very recent decisions of this court. In *Douglass* v. *County of Pike* (101 U. S. 677), upon a review of some of the previous cases, the court, speaking by the present Chief Justice, said that "the true rule is to give a change of judicial construction in respect to a statute the same operation on contracts and existing contract rights that would be given to a legislative amendment; that is to say, make it prospective, but not retroactive. After a statute has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the text itself; and a change of decision is to all intents and purposes the same in its effect on contracts as an amendment of the law by means of a legislative enactment. So far as this case is concerned, we have no hesitation in saying that the rights of the parties are to be determined according to the law as it was judicially construed to be when the bonds in question were put on the market as commercial paper."

For these reasons, and without reference to any other questions discussed, we are of opinion that the rights of the plaintiff, as the owner of bonds issued under a statute which, when passed, was valid by the laws of Michigan, as declared and acted upon by the several departments of its government, are not affected by decisions of the Supreme Court of the State rendered after the railroad company, to whose rights the plaintiff succeeded, had earned the bonds under contract with the city made in conformity with the statute. Upon the case as

presented the jury should have been instructed to find for the plaintiff, rather than for the defendant.

*Judgment reversed with directions to set aside the verdict, and for such further proceedings as may be consistent with this opinion.*

Mr. Justice Gray did not sit in this case, nor take any part in deciding it.