## Young v. Township of Clarendon, impleaded, etc.

*(Circuit Court, E. D. Michigan.  February 15, 1886.)*

1. MUNICIPAL CORPORATIONS — BOND ISSUED TO CONSOLIDATED RAILROAD COMPANIES — ESTOPPEL.

   When a municipality contracts with and issues its bonds to a railroad company formed by the consolidation of two other companies, it is estopped to question the validity of the consolidation.

2. SAME — VOTE OF TOWNSHIP TO ISSUE BONDS — STATUTE UNCONSTITUTIONAL — SUBSEQUENT DECISION OF SUPREME COURT — RIGHTS OF CREDITORS OF RAILROAD.

   A township, having voted to aid the construction of a certain railroad, issued its bonds for that purpose, and deposited them in escrow with the state treasurer to await the certificate of the governor of the completion of the road. While the road was in progress, the law under which the bonds were issued was declared to be unconstitutional, and the bonds were returned by the state treasurer to the township. The company went on and completed the road. Subsequently the bonds were declared by the supreme court of the United States to have been rightfully issued, and a judgment creditor of the road filed his bill to obtain the benefit of them. *Held*, that the surrender of the bonds by the state treasurer, and their retention by the township, was a conversion which entitled the company to bring immediate suit, and that the bill, not having been filed until 13 years after the bonds were surrendered, must be dismissed.

On Demurrer to Bill in Equity.

This was a bill filed in 1885 by a judgment creditor of the Michigan Air Line Railroad Company to realize for his own benefit the amount of certain bonds, issued by the defendant township under the railroad aid law of this state, which had been deposited with the state treasurer, and were held by him for the benefit of the road, until the

law was declared unconstitutional, and were then returned to the township authorities. The bill set up a judgment of this court in favor of the plaintiff against the railroad company for $355,865.24 for the construction of a portion of the road, the issue and return of an execution unsatisfied, and the non-payment of the judgment. The bill further averred the defendant railroad to be a corporation organized on the twenty-eighth of August, 1868, by a consolidation of two companies, one organized under the law of Michigan, and the other under that of Indiana; that on the eighth of October, 1870, this consolidated road was again consolidated with the St. Joseph Valley Railroad Company; still, however, retaining its name of the Michigan Air Line Railroad; that on the twenty-first day of June, 1869, the electors of the defendant township voted to pledge the aid of the township to the company by a loan of its bonds in the sum of $10,-000, upon certain terms and conditions, provided the road should be constructed through such township, and would pay a certain proportion of its dividends in extinguishment of the interest upon the bonds and a certain other proportion to apply upon the principal. Bonds were subsequently issued, and in July, 1869, were delivered to the state treasurer to await the certificate of the governor of the completion of the road as required and authorized in such cases. The agreement required by the resolutions of the township was executed by the railroad company. The road was in process of construction, when on May 26, 1870, the supreme court of the state declared the law under which the bonds were issued to be unconstitutional. Notwithstanding this decision, the company went on, and completed the road, in full compliance with the conditions of the pledge, and applied to the governor of the state for his certificate that it had complied with the provisions of the act, and was entitled to the bonds. The governor declined to issue his certificate, giving as his sole reason for refusing that the law had been declared unconstitutional. The bill further averred that in May, 1872, the township, without the knowedge of the railroad, and in fraud of its rights, induced the treasurer to surrender to it the bonds and coupons which the township has since retained; that the railroad company has never made or paid any dividends; that the bonds became, in justice and equity, the property of the company, and the township became bound upon the same, according to their tenor and effect; and that the plaintiff is entitled to the amount of such bonds and coupons, with interest thereon, to be applied in payment of his judgment against the railroad company. To this bill the defendant township demurred, upon the grounds set forth and discussed in the opinion.

*Conely & Lucking*, for plaintiff.

*Boudeman, Marston & Gibson*, for defendant.

BROWN, J. The first and second grounds of the demurrer, which may be considered together, are based upon the theory that there is

no such sufficient averment of a consolidation of the two Grand Trunk Railways of Michigan and Northern Indiana. It is not alleged that the legislature of Indiana ever authorized the consolidation, nor that the directors of the two companies entered into an agreement to consolidate, nor that a stockholders' meeting was called to sanction such an agreement, nor that such an agreement was filed with the secretary of state as required by law. Doubtless, the legislature of this state could not alone authorize this consolidation. A legal consolidation of two roads in different states can only be had by the concurring act of the proper authorities of both. So, too, if the plaintiff derived his right to file this bill by virtue of the consolidation, it would perhaps be necessary to set forth in detail the successive steps to a legal consolidation. *Peninsular Ry. Co.* v. *Tharp*, 28 Mich. 505; *Rodgers* v. *Wells*, 44 Mich. 411; S. C. 6 N. W. Rep. 860. But the bill avers this consolidation to have been effected on the twenty-eighth of August, 1868; the resolution to aid the company in the construction of its road to have been adopted in June, 1869; and the bonds to have been issued in January, 1870. In other words, the township contracted and dealt with the consolidated company, and is therefore estopped to question the validity of its organization. Field, Corp. § 385.

Putting aside all the other technical objections to the bill, any of which, if valid, may be readily surmounted by an amendment, we proceed to the consideration of the merits of the case. The questions presented, though involving directly or indirectly some millions of dollars, require no elaborate discussion. The object of the bill is to obtain the benefit of certain bonds issued by the defendant township, in aid of the Michigan Air Line Railroad Company, and deposited with the state treasurer, to await the certificate of the governor of the completion of the road. Before the road was built the law under which the bonds were issued was decided to be unconstitutional. *People* v. *Salem*, 20 Mich. 452, and the bonds were returned to the township and canceled. Nevertheless, the company proceeded to complete the road, and earned the right to the bonds, upon the theory adopted by the supreme court of the United States that the law was constitutional. *Township of Pine Grove* v. *Talcott*, 19 Wall. 666; *Taylor* v. *Ypsilanti*, 105 U. S. 60. Had this court been one of general jurisdiction, with power to issue original writs of *mandamus*, we are inclined to think that such a writ might have been awarded upon the application of the present plaintiff, if made before the bonds were surrendered by the state treasurer. It is possible, too, that a bill for a mandatory injunction might have been sustained in this court for the same purpose, but the bonds, having been returned to the township, and 14 years having passed since the completion of the road, and the right to the bonds had accrued, it is manifestly too late to institute any proceedings upon the theory that the plaintiff is entitled to the bonds themselves, or to their value, at the time they should

have been delivered to the company. In this connection, we take it for granted that the plaintiff stands in no better condition to enforce the obligation of the township (except by reason of his non-resident citizenship) than the company would have had had proceedings been instituted in its name.

Recognizing the insuperable difficulty of maintaining a bill in this aspect, plaintiff seeks, by the present bill, to treat the bonds as if they had been actually delivered to the company, and to sue upon them as lost or destroyed instruments. In the twenty-fifth paragraph of his bill, he prays that the court will adjudge and declare that the company earned these bonds, and was entitled thereto, and that the township is equitably indebted to the company in the whole amount of the bonds and coupons, with interest thereon; that the court will ascertain the amount equitably due from the town, and decree that it pay such amount to the plaintiff towards the satisfaction of his judgment. The defendant takes the position that there was never any contract between the township and the railroad company; that the act of the township in voting to make the loan was its separate and independent act, and the building of the railroad a separate and independent act of the company; that there was no consideration or mutual promise that in any way obligated the township to make the loan; and that the only mode by which such contract relation could be created was by the actual delivery of the bonds to the company. We cannot assent to this proposition. We think that the pledge voted by the township, the agreement executed by the railroad company in compliance with the second condition of this pledge, as set forth in paragraph 17 of the bill, and the delivery of the bonds to the state treasurer, amounted to the consummation of a contract between the township and the company, and that the construction of the road entitled the company to the bonds. We think we are justified in holding this to be a contract, by the language of the opinion in *Taylor* v. *Ypsilanti*, 105 U. S. 60, 72, and *New Buffalo* v. *Iron Co.*, Id. 73.

The cases cited by the defendant are not controlling in this particular. In the case of *Aspinwall* v. *Commissioners of Daviess Co.*, 22 How. 364, stock was subscribed and bonds issued by the county commissioners, in compliance with the vote of the county held on the first of March, 1849, but before the subscription was actually made the state adopted a new constitution which went into effect November 1, 1851, one of the articles of which prohibited such subscriptions. In 1852 the county commissioners subscribed for stock, and issued its bonds, and it was held that a mere vote to subscribe did not of itself form such a contract as would be protected by the constitution of the United States, and that until the subscription was actually made the contract was unexecuted. It is readily distinguished from the present case in the fact that these bonds were actually issued, and placed in escrow in the hands of the state treasurer

to await the completion of the road, and that the company went on and built the road upon the faith of the bonds. The township had done the last thing it was required to do by its pledge. Practically the same position was taken by the supreme court of Illinois in the case of *People* v. *County of Tazewell*, 22 Ill. 147, in which it was held that, until the county or city had subscribed, there was no privity between the road and county or city. "It is the contract of subscription which compels the subscriber for stock to pay his money, and the company to issue to him his shares of their stock. Until the county subscribes for shares of their stock the company held no obligation upon the county, and cannot, by tendering shares of stock, compel them to subscribe or issue bonds, nor have they any power to compel the road to issue to them shares of their stock. Until the subscription is made, it is entirely at the option of the road whether they will permit such a subscription. Before the subscription is made no obligation exists between the parties. Nor can the vote be treated as an agreement between the county and the road, beyond what the law has peremptorily required to be performed. When the vote was taken, and resulted in favor of the subscription, it only amounted to a delegation of power to the supervisors to make the contract of subscription, as the law then authorized them to do."

It is too clear for argument that this language has no application to the case under consideration. In the case of *Falconer* v. *Buffalo, etc., R. Co.* 7 Hun, 499, it was held, in the same terms, that the consent of a majority of the tax-payers of a town that the bonds of the town might be issued in aid of the construction of a railroad, gave no right to the company that a court of law or equity would enforce against the town, because the company was not bound to receive the bonds. It could not compel the persons appointed to issue the bonds, because they owed no duty, at that stage of the case, to the company. Here, too, the transaction was wholly incomplete on the part of the town. The present case would have been similar if the township had stopped with the bare pledge, and never issued the bonds. In *Town of Concord* v. *Portsmouth Sav. Bank*, 92 U. S. 695, the bonds were voted in November, 1869, provided the company would run its road through the town. On the twentieth of June, 1870, the company gave notice of its acceptance of the donation, and on July 2, 1870, a new constitution was adopted annulling the power of any municipality to make donations or loan its credit to railroad companies. Notwithstanding this, in October, 1871, the bonds were issued by the supervisor and town clerk. It was held that, as the town had no authority to make a contract to give, and the acceptance of the company was an undertaking to do nothing which it was not bound to do, no valid contract arose from such offer and acceptance. The opinion was placed upon the ground that the donation was not permitted to be made until after the completion of the location and construction of the road through the town; that the popular vote was

not itself a donation, and that the town was not authorized to make it until the road was located and constructed. Before that time, and before any attempt at a donation or appropriation was made, the authority was withdrawn. The town had authority to make a donation, but it had no authority to make a contract to give, and, as the donation was made after the constitution took effect, it was very naturally held to be void. Here the act expressly authorizes the bonds to be issued before the road was completed, and this act, as we are bound to hold, was never repealed or annulled to the disturbance of vested rights.

It is true, there was no delivery of these bonds to the company, but they were executed and delivered in escrow to the state treasurer, and upon the performance of the condition upon which they were deposited the title to them vested in the company, notwithstanding they were not actually delivered. *Couch* v. *Meeker*, 2 Conn. 302; *Taylor* v. *Thomas*, 13 Kan. 217; *Jackson* v. *Catlin*, 2 Johns. 248; 1 Washb. Real Prop. The governor's certificate was merely a formal act,—the proper evidence upon which the state treasurer was empowered to deliver the bonds to the company; but in no sense a condition precedent to the company's rights to them when withheld for any other reason than the failure to complete the road. Had this bill been promptly filed, we see no escape from the conclusion that the plaintiff would have been entitled to a decree for the value of the bonds; but, in the view we have taken of the case, the surrender of the bonds by the state treasurer, and their receipt by the township, was a conversion, and entitled the plaintiff to bring immediate suit for their value. *Knight* v. *Legh*, 4 Bing. 589; *Outhouse* v. *Outhouse*, 13 Hun, 130. Having the right to sue he was bound to exercise such right within the time allowed by law for that purpose. He might also waive the tort, and bring *assumpsit* for their value; but where, as in this case, the right of action attaches immediately, we do not think he can wait until the maturity of the bonds, and sue upon them. In neither of the two cases above cited from Connecticut and Kansas, where the right to sue upon the instrument was sustained, did the question of conversion arise. In *Couch* v. *Meeker*, 2 Conn. 302, the note was put as an escrow into the hands of a third person, subject to the performance of a certain condition. Plaintiff brought suit upon the note, and averred that the condition had been performed, and the depositary brought the note into court, and plaintiff was held entitled to recover. In *Taylor* v. *Thomas*, 13 Kan. 217, it does not appear in whose hands the note was at the time the suit was begun, but there was no evidence of conversion. It is true that the case of *Lamb* v. *Clark*, 5 Pick. 193, is an apparent authority for the proposition that an action of *assumpsit* may be maintained notwithstanding the time for bringing an action of trover may be barred by the statute. In this case the defendant fraudulently procured of the plaintiff's intestate a quantity of notes and securities.

The transaction took place more than six years before the commencement of suit. It appeared that the notes were paid to the defendant by the makers thereof at various times, some more and some less than six years before the suit was begun. The defendant contended that if there was fraud in the transaction it was barred by the statute of limitations, but the court held that, notwithstanding the notes were obtained by fraud, the plaintiff might recover all such moneys as were received by the defendant from the makers of the notes within six years before the commencement of the action; holding substantially that the defendant could not take advantage of his own fraud by pleading the statute of limitations. "There are cases," says the court, "where the injured party may have his election of remedies; as, where there has been a tortious taking of his property, he may bring trespass or trover, or he may waive both and bring *assumpsit* for the proceeds when it shall have been converted into money. And if he chooses the latter mode of redress, the tort-feasor cannot, we think, allege his own wrong, for the purpose of carrying back the injury to the time which will let in the statute of limitations." But the rule enforced in this case, that no one shall take advantage of his own wrong, has no just application to a technical wrong of the kind set forth in this bill. Under the law, as construed by the supreme court of this state, the secretary of state could do no otherwise than return the bonds to the township. Probably he might have been compelled to do so by *mandamus,* and the township officers were guilty of no actual fraud or wrong in failing to recognize them until compelled to do so. To say that, under such circumstances, they cannot plead that the statute of limitations has run against the tort, would be a manifest perversion of the maxim.

The position of the plaintiff in this suit assumes that the company was bound to wait until the maturity of the bonds before suit could be brought upon them. But we cannot assent to this proposition. The bonds were issued to aid the construction of the road. It is safe to assume that the company did not desire them as an investment, but to raise money, by their negotiation and sale, for the payment of their current expenses. For this purpose they would be entirely useless unless the company could obtain possession of them. To this possession it was entitled, and the withholding of it was a conversion, and from this time if the statutes of limitation did not begin to run at law, the duty of a party seeking equitable relief, to act promptly, attached. This view is not only the more just and equitable as respects the plaintiff, but the proposition for which he now contends would operate with extreme hardship upon the defendant township. These bonds, amounting in all to $10,000, were made to mature in sums of $1,000 each year, from 1871 to 1880, with 10 per cent. interest. This amount distributed, as was contemplated, over a period of 10 years, might be easily raised by taxation, while a decree for the entire amount, rendered six years after the longest bond had ma-

tured, would fall with crushing weight upon the township, and upon individuals who had purchased or dealt with property there, upon the theory that the bonds were no longer valid obligations.    As no interest had ever been paid upon these bonds, there was nothing to apprise the town that they would ever be enforced, until this bill was filed. Upon the whole, we think, the delay in this case is fatal.

A decree will be entered, dismissing the bill, with costs.