MORELAND v. MILLEN.

CONSTITUTIONAL LAW—LOCAL SELF-GOVERNMENT—DETROIT SUPER-INTENDENT OF PUBLIC WORKS — PROVISIONAL APPOINTMENT — RATIFICATION BY CITY — VACANCY—APPOINTMENT BY MAYOR — STATUTES—PARTIAL VALIDITY.

Act No. 284, Local Acts 1901, creates a department of public works for the city of Detroit, the responsible head of which shall be an officer known as the "Superintendent of Public Works;" and provides that the governor shall make a provisional appointment to such office, the appointee to hold until the third Tuesday of January, 1902, from which time regular appointments shall be made by the mayor; that any vacancy in said office, occurring either before or after the expiration of the provisional term, shall be filled by the mayor; and that, on the appointment and qualification of

such superintendent, he shall become vested with all the powers and duties of the existing board of public works, which shall thenceforth be abolished. *Held:*

(1) That, it being apparent on the face of the act that there was no exigency calling for a provisional appointment by State authority, so much of the act as provides therefor is void as an invasion of the right of local self-government.

(2) That the action of the city controller in approving the bond of the governor's appointee was not such a ratification of the appointment by the city as to render it valid.

(3) That the rest of the act may be sustained, and, the appointment by the governor being invalid, a vacancy exists, which may be filled at once by the mayor.

MOORE and GRANT, JJ., dissent from the last proposition, being of opinion that, the term of office of the present mayor expiring before the time fixed for the first regular appointment of superintendent, it is apparent that the main purpose of the act was to remove the department of public works from under his control, and that, such purpose failing, the whole act should fall together.

*Certiorari* to Wayne; Frazer, Carpenter, Donovan, Rohnert, Hosmer, and Brooke, JJ. Submitted March 21, 1901. Reargued April 18, 1901. Decided April 25, 1901.

*Mandamus* by De Witt H. Moreland to compel James W. Millen, Herman F. Kallman, and Marshall H. Godfrey to surrender to relator the offices, books, papers, etc., in respondents' custody as members of the board of public works of the city of Detroit. From an order denying the writ, relator brings *certiorari*. Affirmed.

*Fred A. Baker* (*Otto Kirchner* and *John J. Speed*, of counsel), for relator.

*Edwin F. Conely* and *Orla B. Taylor* (*Charles Flowers*, of counsel), for respondents.

*Timothy E. Tarsney*, Corporation Counsel, for city of Detroit.

HOOKER, J. For many years a board of public works

has existed under provisions of law in the city of Detroit, with certain prescribed duties. Previous to the legislation giving rise to this litigation, the respondents constituted such board, and continue to perform the functions of such office to the present time. At its present (1901) session, the legislature has passed a law (Act No. 284, Local Acts 1901) providing for the substitution of a single officer, called "Superintendent of Public Works," in the place of the board of three; and the relator, claiming to have been lawfully appointed by the governor, applies for a *mandamus* to compel a surrender by respondents of the offices, *i. e.*, the rooms, occupied by said board, and all books, records, papers, property, and money in their custody by virtue of their former incumbency as members of said board. This relief being denied by the circuit court for the county of Wayne, the case is before us upon *certiorari*, on application of the relator.

The facts are not in dispute, and the case must turn on the total or partial validity or invalidity of the act of 1901 already mentioned. The act is entitled "An act to establish a department of public works in and for the city of Detroit, and to repeal all acts or parts of acts in conflict therewith." It was given immediate effect. Section 1 provides that there shall be in the municipal government of Detroit a department to be known as "The Department of Public Works of the City of Detroit," and the responsible head shall be an officer to be known as "Superintendent of Public Works." It also provides what shall be done by the appointee to qualify. Section 2 requires the governor to make a provisional appointment to said office within five days after the time when the act shall take effect; the appointee to hold said office until the third Tuesday in January, 1902, at which time his successor shall be appointed by the mayor for a term of four years, next ensuing. Should a vacancy occur before the third Tuesday in January, 1902, the office is to be filled by appointment by the mayor for the unexpired period of said provisional term, and if after the third Tuesday in

January, 1902, for the unexpired portion of the full term of four years. Section 4 provides that, when a superintendent of public works shall have been appointed and qualified as provided, it shall be the duty of the present board of public works to surrender the offices occupied by it, and all books, records, papers, property, and money belonging or appertaining to said board, and thereafter the same shall be vested in the superintendent of public works. Section 5 provides that, "from and after the appointment and qualification of a superintendent of public works under this act, all the powers, duties, and functions heretofore vested in and exercised by the board of public works, excepting as herein altered or modified, shall be vested in, and be exercised and performed by, the superintendent of public works, and he shall take the place of said board in the municipal government of the city of Detroit." Section 10 provides that "the board of public works of the city of Detroit, and the offices of the members of said board, are abolished from and after the appointment and qualification of the superintendent of public works provided by this act."

It is noticeable, by reference to sections 5 and 10, that the board is not abolished, nor is its authority devested, until a superintendent has been appointed and has qualified. Manifestly, this should be construed to mean legally appointed and qualified, and an unauthorized appointment would not have the effect to abolish the board; and we must conclude that the legislature designed to perpetuate the board until the superintendent should be in a situation to lawfully assume its functions.

The power of the legislature to substitute a single officer for a board of three members appears to be conceded, whatever may be thought of the propriety or wisdom of making such a change in opposition to the wishes of a portion of the inhabitants of Detroit; but it is urged that the legislature has neither the power to fill the office by its own appointment, nor to authorize an appointment, except by the locality itself, or through its local officers; and it is

insisted further that, if the legislature may make or provide for a provisional appointment by the governor, this is not a provisional appointment.

It is not apparent to us from the terms of the law, or from circumstances of which we may take judicial notice, that there was a necessity for departing from the rule which gives to the city the right to select its officers for the conduct of its local affairs; but is it clear that the validity of the provisional appointment must depend upon our opportunity to know and understand the circumstances which led the legislature to determine that there was an exigency? It has not taken us or the public into its confidence by incorporating the reasons for its action in the law. We do not know why this act could not as well have authorized appointment by the local authorities; nor do we know why its operation could not have been postponed until January, 1902. We should presume that the legislature did know of reasons which were satisfactory to the members, unless the contrary appears. I think it cannot be said that the legislature may not make or authorize a provisional appointment to a local office. It is, of course, sufficient for the purpose of this case to hold that the appointment provided for in the act under discussion exceeded the powers of the legislature, in which we are agreed.

It is doubtful if we should say that an appointment is necessarily not provisional if the period of its duration is definitely fixed (see *Luehrman* v. *Taxing Dist.*, 70 Tenn. 441), or that a law providing for such an appointment for a short period is not provisional when it distinctly states that it is, and contains clear evidence of an intention to commit the subject of future appointment to the local authorities, or unless it can be said to appear from the act itself, and facts of which we may take judicial notice, that there is no exigency, or that the provisional appointment extends beyond the exigency. If such provisional appointments may be ever lawfully provided for or made, the court should be as careful about overturning such

126 MICH.—25.

legislation as any other. It should be done only when, upon the face of the law, it is apparent that the legislature has violated constitutional rights. Doubts should be resolved in favor of the law. In the *Hurlbut Case*, 24 Mich. 44 (9 Am. Rep. 103), the court was able to say that the exigencies of the situation did not require a deprivation of the right of local selection for eight years, especially as the law did not purport to provide for a provisional appointment. But this law expressly treats the appointment provided for as provisional, and provides for turning the entire control over to the locality within a year, at furthest, and sooner if a vacancy shall sooner occur in the office of superintendent. Such a law should not be held invalid for the reason that the exigency is not apparent to us, but only when we can say that it is apparent that there is no exigency, or that it is not intended to provide for the exigency, or as a temporary expedient. In this case this fact does appear. Not only do we discover no evidence of an exigency, but the act itself indicates its absence, as it provides for appointment by the mayor in case of a vacancy at any time after the appointment by the governor. We take the view that there was no exigency, and therefore that a provisional appointment was not necessary, and the legislature exceeded its power when it provided for any provisional appointment whatever.

Counsel urge that the act is, at all events, not absolutely void, because the city might have acquiesced and accepted it, and, this being so, the appointment would become valid when accepted, and the appointment made under it would be valid until attacked, when there would be a vacancy, which the mayor might at once fill, and therefore that the act may be, in the main, sustained. Incidentally we may add in this connection that it is claimed that the controller, by accepting Mr. Moreland's bond, accepted or ratified the act and appointment, as was done in the case of *Attorney General* v. *Lothrop*, 24 Mich. 235. I think the controller's act should not be

taken as a ratification of this proceeding, and that it was not within his power; but there is force in the other suggestion. There would be still more if Mr. Moreland had entered upon the duties of his office and obtained control of his department, thereby becoming a *de facto* officer.

It remains to inquire whether the law may stand, with the exception of that portion authorizing the provisional appointment, or must fall as a whole. The propriety of sustaining a portion of an act, where it can be reasonably done, is elementary, and we need not go further than the opinions in the *Case of Hurlbut, supra*, for an enunciation of the doctrine. CHRISTIANCY, J., page 67; COOLEY, J., pages 93, 110. In the present case we should assume that the legislature sought to improve the method of administering the public works. It has provided for radical changes. If it be true that these changes could be as well made under a superintendent appointed by the mayor as under the appointee of a governor, and therefore a provisional appointment was unnecessary and should not be sustained, it does not, in my opinion, necessarily follow that the appointment of a superintendent by the governor, and not a desire to improve the department, was the main object in view. The respect due a co-ordinate branch of the government forbids such a conclusion, in the absence of clear evidence. Why should the act fall, when an appointment may soon be made by the mayor, under the very terms of the act? It cannot be said that there would be an interregnum, during which there would be no board and the department could not act; for the law expressly postpones the abolition of the board until the superintendent is appointed and qualified. I am satisfied that the law may be sustained, although the appointment to fill the vacancy be deferred until the third Tuesday in January, 1902.

But is it necessary that such appointment be so long deferred? It is contended that, the appointment being void, a vacancy exists, which may be filled at once, under the express terms of section 2, which provides

that "any vacancy occurring in said office, by death, resignation, or otherwise, before the third Tuesday of January, 1902, shall be filled by an appointment by the mayor." The great weight of authority sustains this claim, holding that a newly-created office, which is not filled by the tribunal which created it, becomes vacant on the instant of its creation. 19 Am. & Eng. Enc. Law, 431, citing *State* v. *Hyde*, 121 Ind. 20 (22 N. E. 644); *Collins* v. *State*, 8 Ind. 344; *Driscoll* v. *Jones*, 1 S. Dak. 8 (44 N. W. 726); *People* v. *Mott*, 3 Cal. 502; *State* v. *Boone County Court*, 50 Mo. 317 (11 Am. Rep. 415); *Rhodes* v. *Hampton*, 101 N. C. 629 (8 S. E. 219); *Walsh* v. *Com.*, 89 Pa. St. 419 (33 Am. Rep. 771); *Rose* v. *Knox County Com'rs*, 50 Me. 243; *State* v. *Irwin*, 5 Nev. 111; *State* v. *Askew*, 48 Ark. 89 (2 S. W. 349); *Gormley* v. *Taylor*, 44 Ga. 76; *People* v. *Osborne*, 7 Colo. 605 (4 Pac. 1078); *State* v. *Johns*, 3 Or. 537; *Smith* v. *Half-acre*, 6 How. (Miss.) 582; *People* v. *Burch*, 84 Mich. 415 (47 N. W. 765). A contrary view may appear to have been taken in *State* v. *Messmore*, 14 Wis. 163, and our own case of *Conely* v. *Common Council of Detroit*, 93 Mich. 446 (53 N. W. 564); but the latter case is not necessarily conclusive of the question. In that controversy the statute provided that a vacancy in a newly-created office, if caused by death or resignation, might be filled by the electors. The first incumbents were appointed by the council, and it was claimed that such appointment was invalid, for the reason that the law provided that the electors should fill the vacancy; but it was held that, there having been no previous incumbent, there was, manifestly, no such vacancy as the electors were authorized to fill. The language used unequivocally states the rule broadly that there can be no vacancy in an office until there has been an incumbent of that office; but, construed in the light of its facts, the case need not be inconsistent with the general rule, for, under the terms of the act, there could be no vacancy which the electors could fill until there had been an incumbent. We are of the

opinion that it should be so construed, rather than as intended to lay down the broad rule that its language would seem at first blush to import, and therefore that in the present case an appointment may be lawfully made at once by the mayor.

The writ should be denied.

MONTGOMERY, C. J., and LONG, J., concurred with HOOKER, J.

MOORE, J. (*dissenting in part*).   In 1873 an act (Act No. 392, Laws 1873) to establish a board of public works in the city of Detroit became a law.   Under the provisions of this act the board of public works consisted of three members, who were appointed by the common council upon the nomination of the mayor.   In February, 1901, the respondents were the members of that board, in the active discharge of the duties of their offices.   February 14, 1901, the legislature passed a bill abolishing the board of public works, and creating the department of public works, the responsible head of which should be known as the "Superintendent of Public Works."   Act No. 284, Local Acts 1901.   The relator claims to be the superintendent of public works, which claim was resisted by respondents.   A hearing was had before all six of the circuit judges of Wayne county, who were unanimous in the opinion that the relator was not entitled to the writ of *mandamus* for which he had applied.   The case is brought here by writ of *certiorari*.   The proceeding involves the constitutionality of the act of February 14, 1901.   The material portions of this act, so far as relate to this discussion, read as follows:

"SECTION 1.   There shall be a department in the municipal government of the city of Detroit to be known as 'The Department of Public Works of the City of Detroit,' and the responsible head of said department shall be an officer to be known as 'Superintendent of Public Works.'   The person appointed to said office shall qualify by taking and filing with the city clerk the oath of office prescribed by

the Constitution of this State, and he shall also file with said clerk a bond in the penal sum of $50,000, with surety or sureties to be approved by the city controller, conditioned for the faithful performance of the duties of the office.

"SEC. 2. Within five days after this act takes effect, a provisional appointment to said office shall be made by the governor of this State, and the person so appointed shall hold said office until the third Tuesday of January, 1902, when an appointment to said office shall be made by the mayor of said city. The person so appointed by the mayor shall hold the office for the then ensuing term of four years, and until his successor is appointed and qualified. On the second Tuesday in January preceding the expiration of said term of four years, and on the second Tuesday in January preceding the expiration of each succeeding term of four years, an appointment to said office shall be made by the mayor. Any vacancy occurring in said office, by death, resignation, or otherwise, before the third Tuesday of January, 1902, shall be filled by an appointment by the mayor. The person so appointed shall hold the office for the balance of the provisional term; and any vacancy occurring after said provisional term shall also be filled by an appointment by the mayor. The person so appointed shall hold office for the balance of the regular term of four years."

"SEC. 5. From and after the appointment and qualification of a superintendent of public works under this act, all the powers, duties, and functions heretofore vested in and exercised by the board of public works, excepting as herein altered or modified, shall be vested in, and be exercised and performed by, the superintendent of public works, and he shall take the place of said board in the municipal government of the city of Detroit.

"SEC. 6. As soon as practicable after the appointment and qualification of a superintendent of public works under this act, it shall be his duty to appoint a secretary of the department of public works, and a city engineer, and such other subordinate officers, clerks, and employés of the department as the common council of the city has heretofore, or may hereafter, create and establish by ordinance, resolution, or other action of said council. Said secretary and city engineer, and all other officers, clerks, and employés of the department, including those now holding office under the board of public works, shall hold

office and their employments subject to the pleasure of the superintendent of public works; and vacancies may be filled and new appointments may be made by him whenever, in his judgment, the public service may require it."

" SEC. 10. The board of public works of the city of Detroit, and the offices of the members of said board, are abolished from and after the appointment and qualification of the superintendent of public works provided by this act.

" This act is ordered to take immediate effect.

" Approved February 15, 1901."

It is insisted by the respondents that the bill is unconstitutional and wholly void because it deprives the city of Detroit of the right of local self-government. Mr. Tarsney, corporation counsel of the city of Detroit, has been allowed to intervene. His contention, broadly stated, is that the act, as a whole, cannot be sustained, because some of its provisions are unconstitutional, but, with the unconstitutional portions of the bill eliminated, the remainder of the bill makes a complete and valid act, leaving the appointment of the superintendent of public works in the mayor of Detroit. It is the claim of the relator, broadly stated, that the bill, in all its parts, is constitutional, and should be sustained as an entirety, but that, if the court thinks differently, his counsel agree with the corporation counsel that it is good in part, and for that reason may be sustained. The contention of counsel will appear more in detail as the discussion proceeds.

Naturally, the first question involved is, Are the powers conferred upon the department of public works of a local character, and, if so, must not the superintendent of public works be elected or appointed by the local authorities, instead of being appointed by the governor of the State ? Fortunately for this discussion, the question is not a new one in this State. In 1871 the legislature passed an act (Act No. 494, Laws 1871) to establish a board of public works in the city of Detroit. The powers conferred upon the board were substantially the same as those conferred upon the department of public works in the bill

under discussion.   The bill provided for four commissioners named in the bill, one of whom was to hold his office for two years, one for four years, one for six years, and the other for eight years, and for the filling of vacancies, at the expiration of the term of service or otherwise, by the common council of the city.   The constitutionality of the bill was attacked for the reason that the legislature could not appoint local officers whose duty it was to administer local affairs, and the powers conferred referred to local administration.   *People* v. *Hurlbut,* 24 Mich. 44 (9 Am. Rep. 103).   Four opinions were filed in the case, and upon the main question all the judges were agreed.   The opinions are so able that it is well to recall them in part. In discussing the question as to whether cities, as well as townships, were protected by the constitutional guaranty of local self-government, Mr. Justice CHRISTIANCY said:

   '' But when we recur to the history of the country, and consider the nature of our institutions and of the government provided for by this Constitution, the vital importance which in all the States has so long been attached to local municipal governments by the people of such localities, and their rights of self-government, as well as the general sentiment of hostility to everything in the nature of control by a distant central power in the mere administration of such local affairs, and ask ourselves the question whether it was probably the intention of the convention in framing, or the people in adopting, the Constitution, to vest in the legislature the appointment of all local officers, or to authorize them to vest it elsewhere than in some of the authorities of such municipalities, and to be exercised without the consent, and even in defiance of the wishes, of the proper officers, who would be accountable rather to the central power than to the people over whose interests they are to preside, thus depriving the people of such localities of the most essential benefits of self-government enjoyed by other political divisions of the State,—when we take all these matters into consideration, the conclusion becomes very strong that nothing of this kind could have been intended by the provision.   And this conviction becomes stronger when we consider the fact that this Constitution went far in advance of the old one, in giving power to the people which had formerly been exercised by

the executive, and in vesting, or authorizing the legislature to vest, in municipal organizations a further power of local legislation than had before been given to them. We cannot, therefore, suppose it was intended to deprive cities and villages of the like benefit of the principle of local self-government enjoyed by other political divisions of the State."

Speaking to the same point, Chief Justice CAMPBELL said:

"This is no mere political theory, but appears in the Constitution as the foundation of all our polity. There is no middle ground. A city has no constitutional safeguards for its people, or it has the right to have all its officers appointed at home. Unless this power is exclusive, the State may manage all city affairs by its own functionaries. The only reasonable meaning of the constitutional clause in question is that, when the legislature has designated the time and manner of appointment or election, the local authority shall fill the offices as so ordained."

Mr. Justice COOLEY said:

" In view of these historical facts and of these general principles, the question recurs whether our State Constitution can be so construed as to confer upon the legislature the power to appoint for the municipalities the officers who are to manage the property interests and rights in which their own people alone are concerned. If it can be, it involves these consequences: As there is no provision requiring the legislative interference to be upon any general system, it can and may be partial and purely arbitrary. As there is nothing requiring the persons appointed to be citizens of the locality, they can and may be sent in from abroad; and it is not a remote possibility that self-government of towns may make way for a government by such influences as can force themselves upon the legislative notice at Lansing. As the municipal corporation will have no control, except such as the State may voluntarily give it, as regards the taxes to be levied, the buildings to be constructed, the pavements to be laid, and the conveniences to be supplied, it is inevitable that parties, from mere personal considerations, shall seek the offices, and endeavor to secure from the appointing body, whose members, in general, are not to feel the burden, a

compensation such as would not be awarded by the people who must bear it, though the chief tie binding them to the interests of the people governed might be the salaries paid on the one side and drawn on the other. As the legislature could not be compelled to regard the local political sentiment in their choice, and would, in fact, be most likely to interfere when that sentiment was adverse to their own, the government of cities might be taken to itself by the party for the time being in power, and municipal governments might easily and naturally become the spoils of party, as State and National offices unfortunately are now. All these things are not only possible, but entirely within the range of probability, if the positions assumed on behalf of the State are tenable."

Again:

"The State may mold local institutions according to its views of policy or expediency; but local government is matter of absolute right, and the State cannot take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty where the State not only shaped its government, but at discretion sent in its own agents to administer it; or to call that system one of constitutional freedom under which it should be equally admissible to allow the people full control in their local affairs, or no control at all."

Further:

"Some things are too plain to be written. If this charter of State government which we call a 'Constitution' were all there was of constitutional command; if the usages, the customs, the maxims, that have sprung from the habits of life, modes of thought, methods of trying facts by the neighborhood, and mutual responsibility in neighborhood interests, the precepts which have come from the revolutions which overturned tyrannies, the sentiments of manly independence and self-control which impelled our ancestors to summon the local community to redress local evils, instead of relying upon king or legislature at a distance to do so,—if a recognition of all these were to be stricken from the body of our constitutional law, a lifeless skeleton might remain, but the living spirit, —that which gives it force and attraction, which makes it valuable, and draws to it the affections of the people; that which distinguishes it from the numberless constitutions,

so called, which in Europe have been set up and thrown down -within the last hundred years, many of which, in their expressions, have seemed equally fair and to possess equal promise with ours, and have only been wanting in the support and vitality which these alone can give,— this living and breathing spirit which supplies the interpretation of the words of the written charter, would be utterly lost and gone."

Mr. Justice GRAVES said:

"I agree with the Chief Justice that the act before us is unconstitutional, but I base my objections wholly on the point discussed by him touching the official terms, the tenure and mode of choice, of the first members of the board. The act declares that the term shall be eight years; that the four persons designated by name shall hold for two, four, six, and eight years, respectively; and that they shall not be removable except upon preferred charges, which shall be sustained by vote of two-thirds of all the members-elect of the common council. This is a fundamental part of the whole scheme, without which there is no reason to suppose the act would have passed; and the plain meaning of it is that a majority of the board shall, for a term of years, consist of legislative appointees, holding independent of the electors and municipal authorities of Detroit. In view of these express and clear manifestations of the sense of the legislature, I cannot come to any other conclusion than that it was designed that the persons named in the act should hold for fixed and regular terms, and in the same way, precisely, as though they had all been chosen at the same time by the council or voters of the city. Neither the occasion, in point of fact, nor the statute, implies the necessity for any merely provisional appointments. The choice is expressly remitted to the council when vacancies occur, and that body was in existence when the act passed and when it took effect; and its competency and aptitude to appoint in the future will be no greater than it has been. With the lights before us, I think it cannot be said that an appointment by the legislature was demanded to meet the needs of a transition state, or to bridge a chasm between an old and new establishment, or to organize or put in motion a new corporate or municipal organism. We are all of opinion that the legislature is forbidden to make permanent appointments of local officers like those in question. But, if the

difficulty now encountered can be obviated by considering this appointment as merely provisional, no reason is perceived why the legislature may not perpetuate the practice by continuing to appoint through successive amendments of the statute. In that event, though each appointment should be called 'provisional,' still the effect would be the same as if the legislature were avowedly exercising a conceded power to make permanent appointments."

The doctrine of this case has been restated or reaffirmed in *Attorney General* v. *Lothrop*, 24 Mich. 235; *Hubbard* v. *Township Board of Springwells*, 25 Mich. 153; *People, ex rel. Board of Park Com'rs*, v. *Detroit Common Council*, 28 Mich. 228 (15 Am. Rep. 202); *People, ex rel. Attorney General*, v. *Detroit Common Council*, 29 Mich. 108; *Allor* v. *Wayne County Auditors*, 43 Mich. 102 (4 N. W. 492); *Attorney General* v. *Detroit Common Council*, 58 Mich. 213 (24 N. W. 887, 55 Am. Rep. 675); *Attorney General* v. *Trombly*, 89 Mich. 50 (50 N. W. 744).

Counsel for relator say:

"Up to July, 1896, when *Detroit Citizens' St. Ry. Co.* v. *City of Detroit*, 110 Mich. 384 (68 N. W. 304, 35 L. R. A. 859, 64 Am. St. Rep. 350), was decided, many members of the bar entertained the opinion, based upon the utterances of the justices of this court in the *Hurlbut Case* and in other cases, that the cities and villages throughout this State possessed inherent rights, powers, and privileges beyond the reach or control of legislative action. This view largely influenced the doctrine, said to rest upon section 14, art. 15, of our State Constitution, that purely local municipal officers must be chosen by municipal authority. The case last cited utterly demolished it. The court, by Mr. Justice MONTGOMERY, in that case, where the question was for the first time squarely presented, at page 392, said:

" 'This court, in the case of *Taylor* v. *Railway Co.*, 80 Mich. 77 (45 N. W. 335), Mr. Justice GRANT speaking for the court, said: "Municipal corporations derive their sole source of power from legislative enactments." '

"In *Speed* v. *Common Council of Detroit*, 98 Mich. 368 (57 N. W. 406, 39 Am. St. Rep. 555), this court

quoted with approval from the opinion of Chief Justice Waite in *City of Ottawa* v. *Carey*, 108 U. S. 110 (2 Sup. Ct. 361), as follows:

" ' Municipal corporations are created to aid the State government in the regulation and administration of local affairs. They have only such powers of government as are expressly granted them, or such as are necessary to carry into effect those that are granted. No powers can be implied except such as are essential to the objects and purposes of the corporation as created and established.'

" If the proposition announced in the two cases last cited may be taken as universally true, cities and villages in this State no longer have the right to choose their officers, whether ' purely local ' or otherwise."

We think counsel have misapprehended the scope of these decisions. The case of *Taylor* v. *Railway Co.* related to the rights acquired by a franchise granted to it by the village of Bay City. There is not a suggestion in the case that it is competent for the legislature to take from the municipality the right of local self-government. Nor was the question of local self-government involved in *Speed* v. *Common Council of Detroit*. The case of *Detroit Citizens' St. Ry. Co.* v. *City of Detroit*, 110 Mich. 384 (68 N. W. 304, 35 L. R. A. 859, 64 Am. St. Rep. 350), was also one involving the rights acquired by a street railway through a franchise granted by the city. Justice MONTGOMERY quoted from the opinion of Justice COOLEY in *People, ex rel. Board of Park Com'rs,* v. *Detroit Common Council*, 28 Mich. 240 (15 Am. Rep. 210), as follows:

" We intended in that case [*People* v. *Hurlbut,* 24 Mich. 44 (9 Am. Rep. 103)] to concede most fully that the State must determine for each of its municipal corporations the powers it should exercise and the capacities it should possess, and that it must also decide what restrictions should be placed upon these, as well to prevent clashing of action and interest in the State as to protect individual corporators against injustice and oppression at the hands of the local majority. And what we said in that case we here repeat,— that while it is a fundamental principle in this State, recognized and perpetuated by

express provisions of the Constitution, that the people of
every hamlet, town, and city of the State are entitled to
the benefits of local self-government, the Constitution has
not pointed out the precise extent of local powers and
capacities, but has left them to be determined in each case
by the legislative authority of the State, from considera-
tions of general policy, as well as those which pertain to
the local benefit and local desires. And in conferring
those powers it is not to. be disputed that the legislature
may give extensive capacity to acquire and hold property
for local purposes, or it may confine the authority within
narrow bounds; and what it thus confers it may enlarge,
restrict, or take away at pleasure."

The Justice then added:

"This is a clear exposition of plain provisions of the
Constitution. Article 4, §38, reads: 'The legislature
may confer upon organized townships, incorporated cities
and villages, and upon the board of supervisors of the
several counties such powers of a local legislative and ad-
ministrative character as they may deem proper.' The
limitations upon this broad power to confer or withhold
authority are that the legislature may not withhold
authority from the local authorities, and confer it upon an
outside agency."

The decisions of the courts of this State have uniformly
and consistently been to the effect that, while the State
may mold local institutions according to its views of policy
or expediency, local government is a matter of absolute
right, and the State cannot take it away. See, also, *State
v. Denny*, 118 Ind. 382 (21 N. E. 252); Cooley, Const.
Lim. (6th Ed.) pp. 47, 223–226, and cases cited in notes;
1 Dill. Mun. Corp. (4th Ed.) §§ 9, 12, 45, 58a, 72, and
notes.

It is said the department of public works is of more than
local concern; that as it has control of the streets and
sewers, and as good streets and good sewers conduce to
good health, this department exercises powers of State
concern. It may be conceded that good streets and good
sewers are desirable from the standpoint of health; but
the benefit to health in the construction of streets and

sewers is incidental, and is not the main purpose for which the streets and sewers are kept in order. The argument based upon the proposition that the public health is subserved by the construction of streets and sewers, and for this reason the relator is not a local officer, would apply with equal force to overseers of highways and streets; and, if the argument is to be accepted, one step further will be taken in the direction of taking from the locality the election or appointment of local officers. No decision in this State has gone so far as counsel propose. On the contrary, it has been held that, because the care of the highways is a local matter, their custody in the townships cannot be taken from the local officers. *Hubbard* v. *Township Board of Springwells,* 25 Mich. 153; *Davies* v. *Board of Sup'rs of Saginaw Co.,* 89 Mich. 295 (50 N. W. 862). The same rule is applicable to cities.

It is strenuously urged that it was competent for the legislature to make, or authorize the governor to make, a provisional appointment, to set in motion the machinery it had created; that the appointment made by the governor is provisional; that the old board is abolished, and a department of public works created, thus making an exigency calling for a provisional appointment, to be met by legislative action, which, if not unreasonable, must be sustained,—citing the opinions of Justices Christiancy and Cooley in the case of *People* v. *Hurlbut, supra.* As has already appeared, the justices were all agreed upon the main question in that case. Upon the question as to whether the appointments made by the legislature might not be treated as provisional, the appointees continuing in office long enough to put the new system in operation, the judges were equally divided; and the law never took effect, and nothing further was done under it. In 1873 the law now in existence, conferring upon the local authorities the appointment of the commissioners, was passed. The case, then, cannot be said to control this case. We have already quoted from the opinion of Jus-

tice GRAVES upon this point.    Chief Justice CAMPBELL said:

"Assuming (what I think is not admissible) that the legislature could make provisional appointments to set an act in operation, this is not such action.    The board appointed have no other or different powers than any of their immediate or remote successors would have.    The law contains nothing requiring or authorizing any mere preliminary action.    The officers are to hold by classified terms, just as the judges of the Supreme Court and board of regents did, for two, four, six, and eight years; and no successors can be chosen by the city, short of the expiration of those periods, without directly violating the terms of the law.    It is not admissible construction to insert a meaning which is inconsistent with, and positively contradicts, the plain terms of the statute."

We are all of us ready to yield our assent to the great ability of all the judges who took part in the decision of *People* v. *Hurlbut;* but, speaking for myself, if local self-government means all that all the judges agreed it did, I do not think the reasoning of Justices CAMPBELL and GRAVES is met by the opinions of the other judges. But, be that as it may, the conditions here are very different from what they were when the act of 1871 was passed.    The act called into existence an entirely new board, which took the place of several boards, and conferred upon the new board broader powers than were possessed by any of the old boards; and it is quite probable that the putting in operation the machinery of the new board, so as to avoid confusion and injustice, might require provisional appointments, to meet which emergency the legislature named in the bill the members of the new board.    What is the situation here?    The department of public works, as created by the act of 1901, possesses practically the same powers which were possessed by the board of public works.    The only substantial change is to change the name, and to confer upon the superintendent the powers and duties now exercised by the three commissioners.    The machinery of the department was

already installed and in motion. There was no exigency, apparently, for the legislature to make a provisional appointment. At least, they did not do so, but conferred that duty upon the governor of the State. The city of Detroit was in full exercise of its powers and functions. There was no vacancy in the office of mayor. Its common council could be called together at any time. What exigency is shown by the provisions of the bill itself, or by the facts, which would authorize the legislature to confer upon the executive of the State the duty to make a provisional appointment of a local officer, instead of leaving it to the local authorities? I think the answer is, no such exigency exists.

It is said the appointment for a fixed term by State authority to a purely local municipal office is not wholly void; citing *Attorney General* v. *Lothrop*, 24 Mich. 235. The opinion in that case is a very short one. It holds that the functions of the commissioners are local and municipal, and their appointments cannot be made without the assent of the local people or authorities, and that such assent had been given in that case. The case presented is entirely different from the one we have here. No action has been taken by the common council or the mayor, or any one acting for the local authorities (unless it is the simple approval of the bond of the relator by the city controller), showing any ratification of the appointment by the governor; so that it cannot be said the local authorities have in any respect approved of this appointment. For one, I am not prepared to say that any city officer, or the council itself, or the mayor, or all combined, can surrender the right to local self-government.

It is argued that the present mayor was not elected with the understanding that, by the appointment of a single officer, he could give control of the public works to his appointee; and the question is asked, Is it not proper for the legislature to provide that, before he can exercise such power, a new election should intervene? It is also said that a municipal officer elected or appointed for one pur-

pose may not be made by the legislature an agent or representative of the municipality for another purpose. Can it be said the governor was elected with the understanding that, by the appointment of a single officer, he could give control of the public works of the city of Detroit to his appointee, and the intervention of an election was not necessary? If this was one of the issues of the election of the governor, why should the electors not residents of the city of Detroit, and who are not interested in its local affairs, have the right to decide the issue by their votes? If the mayor or other municipal officer elected or appointed for one purpose may not be made by the legislature an agent or representative of the municipality for another purpose, may the governor be made such agent or representative? The questions suggest their own answers. By the law as it now stands, the common council, upon the nomination of the mayor, appoints the members of this board. Such powers are germane to the duties of the mayor or aldermen, or both, and are usual powers. The mere fact that the control of the entire department may pass to a single superintendent of public works at one time, instead of to three commissioners of public works at different times, does not give the right to take the appointment away from the local authorities and confer it upon the governor.

Justice CAMPBELL was quite right when he said our Constitution cannot be understood or carried out at all except on the theory of local self-government. It has always been a part of the English and American systems of government. The vital idea of our system is that local affairs shall be managed by local authorities, and general affairs only by the central authority. It has been well said by an eminent author:

"Obviously, the preservation of local self-government is essential to the very idea of a federal union. Without the town meeting, or its equivalent in some form or other, the federal union would become *ipso facto* converted into a centralizing imperial government. Should anything of

this sort ever happen,—should American towns ever come to be ruled by prefects appointed at Washington, and should American States ever become like the administrative departments of France, or even like the counties of England at the present day,—then the time will have come when men may safely predict the break-up of the American political system, by reason of its overgrown dimensions and the diversity of interests between its parts. States so unlike one another as Maine and Louisiana and California cannot be held together by the stiff bonds of a centralizing government. The durableness of the federal union lies in its flexibility, and it is this flexibility which makes it the only kind of government, according to modern ideas, that is permanently applicable to a whole continent." Fiske, Am. Pol. Ideas, 92.

If this legislation can be sustained, the legislature, by the passage of similar acts, can give control to the appointees of the governor of the fire commission, the public-highway commission, the board of assessors, the office of city controller, and the other administrative offices of the city. Under the guise of making provisional appointments, the city may be deprived of the right of local self-government, and its administrative departments turned over to the appointees of the governor until another mayor is elected, whenever the legislature may desire to do so. As was well said by Justice GRAVES in *People* v. *Hurlbut*, by successive amendments of the statute this practice could be continually perpetuated.

We now come to the proposition that this act, though unconstitutional in part, may be sustained by eliminating the bad and retaining the good, and the present mayor may at once appoint the superintendent. It is said:

"What, after all, the legislature desired in this instance, was to abolish the Detroit board of public works, and to devolve its duties upon a superintendent of public works. This was the main purpose of this legislation. The filling of the newly-created office was a mere incident."

It is well settled that an act may be unconstitutional in part, and the residue valid. *Campau* v. *City of Detroit,*

14 Mich. 276; *Attorney General* v. *Amos*, 60 Mich. 372 (27 N. W. 571).; *Graham* v. *Muskegon County Clerk*, 116 Mich. 571 (74 N. W. 729). Is this such an act? In discussing the rule in relation to a law part of which is unconstitutional, Justice CHRISTIANCY used the following language:

"It [the law] must be shown to be void in so many or such important particulars that the main general purposes could not be carried into effect without the aid of these objectionable provisions; or that they are such as fully satisfy the court that, without the provisions in question, the legislature would not have passed the act." *People* v. *Hurlbut*, 24 Mich. 73 (9 Am. Rep. 103).

The original text of Cooley, Const. Lim. (6th Ed.) 211, states the following proposition:

"If a statute attempts to accomplish two or more objects, and is void as to one, it may still be in every respect complete and valid as to the other. But if its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fail, unless sufficient remains to effect the object without the aid of the invalid portion. And if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and, if all could not be carried into effect, the legislature would not pass the residue independently, then, if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them."

In the note the learned author says:

"It must be obvious, in any case where part of an act is set aside as unconstitutional, that it is unsafe to indulge in the same extreme presumptions in support of the remainder that are allowable in support of a complete act when some cause of invalidity is suggested to the whole of it. In the latter case, we know the legislature designed the whole act to have effect, and we should sustain it if possible; in the former, we do not know that the legislature would have been willing that a part of the act should be sustained if the remainder were held void, and there is generally a presumption more or less strong to the con-

trary. While, therefore, in the one case the act should be sustained unless the invalidity is clear, in the other the whole should fall unless it is manifest the portion not opposed to the Constitution can stand by itself, and that in the legislative intent it was not to be controlled or modified in its construction and effect by the part which was void."

See *People* v. *Porter,* 90 N. Y. 68; *Jones* v. *Jones,* 104 N. Y. 234 (10 N. E. 269); *Attorney General* v. *Detroit Common Council,* 58 Mich., at page 219 (24 N. W. 890, 55 Am. Rep. 680).

The language used in *Black* v. *Trower,* 79 Va. 123, is instructive:

"In passing the act in question, it was the evident purpose of the legislature not merely to substitute a new plan for the appointment of registration and election officers in place of that which had theretofore been provided by law, but for reasons satisfactory to itself, and as an essential part of the intended substitute, to place the power of appointment in the hands of freeholders. The requirement that the electoral board shall be composed of freeholders is equivalent to a declaration that none but freeholders shall be chosen by the legislature; and there is nothing in the act to warrant the belief that it would have been passed at all, except as an entirety and in the form in which it is. To hold, then, in accordance with the view which has been urged for the respondents, would be, in effect, not only to make a statute, but one which it cannot be assumed the legislature would have been willing to make. This the courts have no power to do, and the matter must be left to the consideration of the legislature. This principle is illustrated by a recent decision of the Supreme Court of the United States, where an act of Congress which, it was claimed, would have been valid as a regulation of commerce with foreign nations and among the States, was held to be void altogether, because it embraced all commerce, including that between citizens of the same State, which was not within the jurisdiction of Congress, and its language could not be restrained to that which was subject to the control of Congress. The court said: 'If we should, in the case before us, undertake to make by judicial construction a law which Congress did not make, it is quite probable we should do what, if the

matter were now before that body, it would be unwilling to do.' *Trade-Mark Cases*, 100 U. S. 82. And to the same effect are numerous cases. We are therefore of opinion that the entire act is inoperative, and that the statutes sought to be repealed are unaffected thereby."

See, also, *Dells* v. *Kennedy*, 49 Wis. 555 (6 N. W. 246, 381, 35 Am. Rep. 786); *Lathrop* v. *Mills*, 19 Cal. 513; *State* v. *Sinks*, 42 Ohio St. 345. In the last-named case, in discussing the inquiry as to whether the legislature would have passed the act with the unconstitutional portions eliminated, the court said:

"It is therefore important to ascertain how that inquiry must be determined. We cannot inquire of the individual members of the legislature, or enter into their thoughts, for the purpose of ascertaining their views; and yet we are not without means to solve this inquiry. Ample means, indeed, are afforded to all. In order to correctly determine this question, it is necessary to understand the state of the law and the evils supposed to exist at the time the Scott law was passed. In his work on Statutory Crimes (2d Ed.), § 77, approved in *State* v. *Vanderbilt*, 37 Ohio St. 590, 643, Mr. Bishop says: Courts 'do not close their eyes to what they know of the history of the country and of the law, of the condition of the law at the particular time, of the public necessities felt, and other like things.' 'Courts, in construing a statute,' said Davis, J., in *U. S.* v. *Union Pac. R. Co.*, 91 U. S. 72, 79, 'may with propriety recur to the history of the times when it was passed; and this is frequently necessary in order to ascertain the reason as well as the meaning of particular provisions in it.'"

Applying these principles of law to the case under discussion, what is the situation? The present mayor of Detroit is now serving his third term. The present board of public works is composed of three commissioners, appointed by the common council upon the nomination of the mayor, whose terms of office are four years each, but one of whom is appointed at a time, unless a vacancy occurs. It is easy to be seen that the present commissioners are appointees of the present mayor. The term of office of the present mayor expires December 31, 1901. The legis-

lature has undertaken by the act in question to abolish the board of public works, and with it all the commissioners appointed by the present mayor, and to substitute in the place thereof a department of public works, the responsible head of which shall be known as "Superintendent of Public Works," who is appointed by the governor, and who shall hold his office, not for a provisional, indefinite time, but for a specific time, to wit, the third Tuesday after the term of office of the present mayor expires. We have already shown that there was no exigency requiring this appointment to be lodged with the governor. It would take the present mayor no longer to appoint a superintendent than it would take the governor, or than it will take his successor in office. It is perfectly apparent that one of the purposes of the legislature was to take from the appointees of the present mayor the control of this important department, and to withhold its control from any appointee of the mayor until his successor should be elected. It is impossible to read the act and believe that the real legislative design can be carried out by allowing the present mayor to appoint the superintendent of public works. To hold that the law should stand as valid, when the purpose of the legislature not only fails, but a purpose directly contrary to what they desired would be accomplished, is contrary to the rule to which we have called attention. We agree with the opinion of the learned circuit judges that:

"To hold this would be to say that the legislature intended to create an office to be filled by the present mayor, when it is perfectly apparent that the purpose of the act was to prevent his making the appointment. To hold this would not be interpreting the law, but legislation by the court."

The writ of *mandamus* was properly refused.

GRANT, J., concurred with MOORE, J.