JEREMIAH W. HORTON *et al. vs.* CITY COUNCIL AND CITY TREAS-
URER OF THE CITY OF NEWPORT.

NEWPORT—MAY 22, 1905.

PRESENT:  Douglas, C. J., Wilbur, Dubois, Blodgett, Johnson, and Parkhurst,.
JJ.

(1)   *Constitutional Law.   Police Commissions.   Local Self-Government.*

Decision in *Newport* v. *Horton*, 22 R. I. 196, that the right of a city to the sole
control of its police force has not been so reserved as to bring it within.
article I, section 23, or article IV, section 10 of the constitution, and estab-
lishing the constitutionality of the act creating a board of police commission-
ers for the city of Newport, affirmed.

(2)   *Police Commissions.   Payment of Salaries of Commissioners Out of*
*Local Funds.*

Where the General Assembly has the right to control the local police of a
town or city it has an equal right to provide for the payment of the expenses

of such local police department out of the local funds of the munici-
pality.

PETITION for writ of *mandamus* on facts fully set forth in
opinion. Heard on answer to alternative writ. Prayer
granted.

PARKHURST, J. This was a petition for a writ of *mandamus*
brought by Jeremiah W. Horton, John H. Wetherell, and
Frederick B. Coggeshall, police commissioners of the city of
Newport, against the city council and city treasurer of the city
of Newport, to compel the payment of the salaries of the peti-
tioners for the month of February, A. D. 1905, as provided in
section 9 of chapter 804 of the Public Laws.

The petition in the first clause sets forth the creation and
establishment of a police commission for the city of Newport,
under chapter 804 of the Public Laws of Rhode Island.  The
second clause recites the appointment, election, and qualifica-
tion of Jeremiah W. Horton, Frederick B. Coggeshall, and
John H. Wetherell, under, respectively, chapters 804, 1032, and
section 63 of chapter 809 of the Public Laws.

The third clause recites the 9th section of chapter 804, as
follows:

"The annual salary of each of the members of said board
shall be one thousand dollars, and of the clerk five hundred
dollars, payable monthly by said city."

The fourth clause alleges that there is due to each of said
petitioners the sum of eighty-three and thirty-three one-
hundredths dollars, as his salary for the month of February,
1905, and the fifth clause alleges that it became the duty of the
city treasurer of the city of Newport to pay out of the funds of
the city the said sum of $83.33 to each of the petitioners as his
salary for the month of February, 1905.

The sixth clause alleges two resolutions passed by the city
council of Newport, directing the city treasurer of said city to
pay no funds from the city treasury for the salary of the peti-
tioners, and the refusal of the city treasurer, in obedience to
said resolutions, to pay said salary or any part thereof to the
said petitioners or to any of them.

The prayer of said petition asks for a writ of *mandamus* to issue against the city council and city treasurer of said city, ordering the city council to revoke said resolution and directing the city treasurer to pay said salary.

The court granted an alternative writ, returnable on the 24th day of March, at which time the defendants filed their answer, the only part of which, material to determination of the present question, is embodied in the seventh clause.

"Seventh: And the respondents further answering say that said section 9 of chapter 804 referred to in the third paragraph of said bill or petition is unconstitutional, null, and void, for that:

"A. That said section 9 throughout infringes the rights of local self-government, fundamental and historic in the State of Rhode Island, enjoyed and preserved from the settlement of its four towns to the adoption of the constitution, which the constitution itself recognizes.

"B. That said section throughout, and particularly the portion thereof set forth in the third numbered paragraph of the said bill or petition, infringes the constitution of the State of Rhode Island, and is contrary to article 1, sections 2 and 23.

"C. That said portion of said section 9 also infringes article 4, section 10, of the constitution of the State of Rhode Island.

"D. That said section throughout infringes article 14, section 2, of the amendments to the constitution of the United States."

(1)    As to the claim that section 9, chapter 804, of the Public Laws of Rhode Island "infringes the rights of local self-government," it has already been decided by this court, in *Newport* v. *Horton*, 22 R. I. 196: "Our conclusion is that the right of a city to the sole control of its police force has not been so reserved as to bring it within article I, section 23, or article IV, section 10, of the constitution; that the act to establish a board of police commissioners for the city of Newport is not unconstitutional on the ground of interference with the right of that city to local self-government, so far as the appointment of a chief of police by said commissioners is concerned; that the petition, therefore, states no ground for relief."

Although the case of *Newport* v. *Horton, supra,* was confined to the single question of the appointment of a chief of police, that being the only question there raised, yet this very question, the chief of police being an appointee of the commissioners, involved the whole question of the validity of the appointment of the commissioners themselves, and the historical discussion of the rights of local self-government, and of the question of the authority of the General Assembly in regard to the control of the police was so fully set forth therein that the scope of that opinion is broad enough to cover the whole question of legislative power in the matter of police. After a full discussion of the status of the towns under the original or parliamentary charter of 1643–4, and of the powers of the General Assembly to control the towns under the charter of Charles II, of 1663, and of the authorities, it is stated (p. 208): "The clear weight of authority sustains the right of the legislature to control police, and equally is it sustained by sound reason."

The whole question of "the right of the legislature to control police" is therefore fully settled in this State by the foregoing case.

(2) The further question here raised is as to the right of the legislature to require the payment of the expenses of the police department by the city of Newport; the respondents contending that, inasmuch as the police commissioners and their appointees are held to be State officers, the State should pay them out of the general State funds, and has no right to require that the city shall pay them out of its funds; that this is an infringement of the same constitutional rights as above set forth.

It would appear, upon general principles, that, if the General Assembly has the right to "control police," although their duties are confined to a certain locality, it would have the equal right to provide for the payment of the expenses of the local police department out of the local funds of the municipality, and that such payment could lawfully be required only out of such funds. And upon examination of the authorities cited, such is found to be the law.

In the leading case of *Mayor, &c., of Baltimore* v. *State,* 15

Md. 376, decided in 1860, after most elaborate argument by very able counsel, this same question of the legislative power to appropriate local funds for the support of the police department was most fully and ably discussed, and the court sustained the act in this particular, as well as generally.

Thus, on p. 397, Martin, J. (Superior Court), says: "The 15th section of the bill presents the question as to the authority of the legislature to confer upon the commissioners the means of raising the money necessary for the execution of the duties imposed upon them, without which, of course, the board would be inefficient and powerless. That portion of the 15th section which confers on the commissioners the authority to estimate what sum of money will be necessary to enable them to discharge the duties imposed on them, and the obligation of the mayor and city council to raise, by assessment and levy upon the assessable property of the city, the sum thus estimated by the board, is not obnoxious to any valid objection, as a question of power. But the commissioners are authorized to issue certificates of indebtedness, in the name of the Mayor and City Council, in the manner, upon the terms, and for the purposes indicated by the bill, upon the contingency of the mayor, register, comptroller, or other proper disbursing officer, failing to comply with the requisitions of the board, and the validity of this power has been contested and defended with great ability by the respective counsel."

And on p. 493, Le Grand, C. J. (Court of Appeals), after an elaborate opinion, says: "The opinion of the learned judge, who decided this case in the Superior Court, shows the bestowal of great care, and his usual ability in its preparation. The views there taken are in full concurrence with those herein presented. The judgment pronounced by him must be affirmed."

The judges were unanimous.

So, in *Young* v. *Kansas City*, 152 Mo., 661, where an official stenographer of the criminal court of Kansas City was required to be paid out of the city treasury, it is said, p. 665: "We have then a court of the State created by law to hear and punish crime in Kansas City. That it was and is entirely competent

for the legislature to require the salary of an official of that court to be paid out of the treasury of Kansas City and be a charge upon the revenues of said city, we have no sort of doubt."

See also *State, ex rel. Police Commiss'rs* v. *St. Louis Co. Court*, 34 Mo. 546, where legislative power of appropriation of county funds for payment of the expenses of the police department, was fully argued and sustained.

So as to the general power of the legislature for the appropriation of funds of county, town, or city, for the purpose of paying for local improvements, or for the payment of disputed claims, &c., see *New Orleans* v. *Clark*, 95 U. S. 644, 654; *Williams* v. *Eggleston*, 170 U. S. 304, 310; *Kelly* v. *Pittsburgh*, 104 U. S. 78, 81; *County of Mobile* v. *Kimball*, 102 U. S. 691; *Guthrie Nat. Bank* v. *Guthrie*, 173 U. S. 528; *Railroad Co.* v. *County of Otoe*, 16 Wall. 667; *State* v. *Williams*, 68 Conn. 131; *City of Philadelphia* v. *Field*, 58 Pa. St. 320; *Springfield* v. *Power*, 25 Ill. 187; *Williams* v. *Cammack*, 27 Miss. 209; *Guilford* v. *Supervisors, &c.*, 13 N. Y. 143; *Agawam* v. *Hampden*, 130 Mass. 528, 530; *Prince* v. *Crocker*, 166 Mass. 347, 359; *Creighton* v. *Supervisors, &c.*, 42 Cal. 446; *Blanding* v. *Burr*, 13 Cal. 353; *Mayor of Baltimore* v. *State*, 15 Md. 376.

In most of the cases cited by the parties, the question of the payment of salaries and expenses of the police department seems not to have been raised, but to have been treated as involved only as incidental to the general question of legislative control.

In Ingersoll on Public Corporations, the latest text-book on the subject (1904), it is stated (p. 199, § 64): "In the absence of constitutional inhibition, the legislature has unlimited power of control over those municipal officers who are charged with the performance of governmental functions devolved upon it, but can not interfere with those officers who perform functions of a distinctly municipal character. This power is illustrated in many of the States by the creation of what is known as the 'metropolitan police' for the larger cities. This police force is usually appointed and controlled by a board of commissioners, chosen either by the legislature or

Governor of the State, as an exercise of the sovereign power of legislation and patronage." Also (p. 205): "It may also create and appoint a board of police commissioners, and regulate the compensation for them and for the police officers of the municipality, and compel their payment out of the municipal treasury. In short, it has been repeatedly adjudicated that the legislature has the same power over the revenues of the municipality that it has over the funds of the State, and may thus direct their application to such purposes as it deems appropriate for the public welfare."

No case is cited by the respondents, nor has any case come to the attention of the court, wherein it is held that, in the absence of an express prohibition in the constitution of a State, the legislature has not full control of the police department of any municipal or local subdivision, and, incidental to such full control, the power to provide for payment of salaries and expenses.

On the contrary, the cases cited by the respondents in their brief, without exception, so far as they at all relate to the question of legislative control of the department of police, or of any of the officers appointed by a police commission, sustain the position heretofore set forth.

The case of *Gooch* v. *Exeter*, 70 N. H. 413, which was a suit by a police officer appointed by police commissioners, for wages at a rate fixed by the commission, against the city of Exeter, is under a constitutional provision which is remarkably like the provisions of the Rhode Island charter of 1663, which then set forth the powers of the General Assembly of Rhode Island with relation to the appointment of officers and commissions, and which are hereafter more fully discussed.

Under similar provisions similar cases have been decided in many other States, and all of them sustain the same position in regard to the legislative power in question. See *Com.* v. *Plaisted*, 148 Mass. 375; *Burch* v. *Hardwicke*, 30 Gratt. 32, 33; *State et al.* v. *Williams*, 68 Conn. 131, 149; *State* v. *Hunter*, 38 Kas. 578; *Ohio* v. *Covington*, 29 Ohio St. 102.

The respondents in argument seem to rest very confidently upon the opinion in the case of *Ex parte Anderson*, 10 Texas

Ct. Rep. 852. In this case the "commissioners" objected to, and the validity of whose appointment was held to be unconstitutional, were said to dominate and have sole control over the city council in regard to the police department, fire department, and the sanitary and street department; and over all franchises and privileges to use the streets of the city for any purpose, or otherwise to exercise any public privilege or advantage in said city, and to prevent the issuance of any bonds by said city for any purpose whatever. They had also various additional powers in regard to legislation, etc., and it appears from the whole case that the powers granted to these "commissioners" practically took away all the powers of the mayor and aldermen. The opinion refers to numerous provisions of the Texas constitution expressly guaranteeing the right of local self-government to the towns and cities, and, among others (p. 857), those of article 3, section 56, where it is provided that "the legislature shall not . . . pass any local or special law, regulating the affairs of counties, cities, towns, wards or school districts; . . . creating offices, or prescribing the powers and duties of officers in counties, cities, towns, election, and school districts," etc., etc. From all which it appears that the act in question creating these "commissioners" and prescribing their powers and duties was in violation of numerous express provisions of the Texas constitution.

In a number of other cases cited upon the respondents' brief, the opinions expressly discriminate between local affairs like a fire department or department of streets, sewers, etc., which are not subject to direct legislative control, and State functions, such as those exercised by the police. For example: In *City of Lexington* v. *Thompson*, 68 S. W. Rep. 477, it is expressly stated on p. 482: "The better opinion as to police systems seems to be that, inasmuch as the State is charged primarily with the preservation of public peace and the protection of life and property in the cities as well as in the rural districts, the city police is, in a large measure at least, a part of the State constabulary and its members perform the functions of State officials in the exercise of delegated State sovereignty. Therefore, in

so far as the police systems of our cities form a part of the State government, they are subject to legislative control."

The same principle is set forth in *State* v. *Fox*, 63 N. E. Rep. 19; *State* v. *Barker*, 116 Iowa, 96; *Moreland* v. *Millen*, 126 Mich. 381; *State* v. *Denny*, &c., 118 Ind. 449; *City of Evansville* v. *State*, &c., Ibid. 426.

The remaining cases cited by the respondents upon this point relate to various attempts on the part of the legislature in different States to control through commissions such matters as fire departments, highway departments, and other matters of purely local cognizance, and do not, in any way, militate against the position with regard to legislative control of the police.

Respondents in their brief and argument insist very confidently and very strongly that chapter 804, Public Laws, is in violation of article IV, section 10, of the constitution of the State, to wit:

"Section 10. The General Assembly shall continue to exercise the powers they have heretofore exercised, unless prohibited in this constitution."

Respondents attempt to show, by historical references to various acts and charters, that this control of police in municipalities was not a power which the General Assembly had ever exercised; and that, consequently, it was a power which was reserved to the people.

It appears, however, upon examination of the charter of 1663 (R. I. Col. Rec. 1664–1677, vol. 2, pp. 9–10), that the General Assembly constituted by that charter was given full power "to elect and constitute such offices and officers, and to *graunt such needfull commissions, as they shall thinke ffitt and requisite,* ffor the ordering, managing and dispatching of the affaires of the sayd Governour and Company, and their successours; and from tyme to tyme, to make, ordeyne, constitute or repeal, such lawes, statutes, orders and ordinances, fformes and ceremonies of government and magistracye as to them shall seeme meete for the good and wellfare of the sayd Company, and ffor the government and ordering of the landes and hereditaments, hereinafter mentioned to be graunted, and

of the people that doe, or att any tyme hereafter shall, inhabitt or bee within the same; soe as such lawes, ordinances and con-stitutiones, soe made, bee not contrary and repugnant unto, butt, as neare as may bee, agreeable to the lawes of this our realme of England, considering the nature and constitutione of the place and people there; and alsoe to apoynt, order and direct, erect and settle, such places and courts of jurisdiction, ffor the heareinge and determininge of all actions, cases, mat-ters and things, happening within the sayd collonie and plan-tatione, and which shall be in dispute, and depending there, as they shall thinke ffitt; *and alsoe to distinguish and sett forth the severall names and titles, duties, powers and limitts,* of each court, *office and officer, superior and inferior;* and alsoe to contrive and apoynt such formes of oaths and attestations, not re-pugnant, but, as neare as may bee, agreeable, as aforesayd, to the lawes and statutes of this oure realme, as are conveniente and requisite, with respect to the due administration of justice, and due execution and discharge of all offices and places of trust by the persons that shall bee therein concerned; *and alsoe to regulate and order the waye and manner of all elections to offices and places of trust."*

An act passed in 1664, at the very first session of the General Assembly after receiving the said charter, related to the police of the several towns (see 2 R. I. Co. Rec. p. 27), as follows:

"It is ordered, That each towne is impowered to apoynt a day for election of their towne officers, and to elect as to chouse Towne Counsell men, soe many as to make vp sixe with the Assistants of each towne, as alsoe Clarke, Tresurer, *Constable* and *Sargant;* and that the sayd officers shall receive ther in-gagement from one of the Assistants."

Whereby it appears that the first provision for election of police or peace officers was for election by the freemen at town meeting.

In 1669 an act was passed requiring each respective town in the colony to "erect, build, make and maintain at their own Charge . . . One good sufficient Pair of Stocks or Cage, for the punishing and securing of Offenders, in such Place

or Places of each respective Town, as shall be to them most convenient." Pub. Laws of R. I. 1767, p. 210.

This is a plain instance of the exercise of legislative control over local municipal expenditure, even if the amounts involved are not large.

A notable instance of the regulation and control of the police is seen in the charter of the city of Providence of 1832, where the "administration of police" is vested in the "mayor and aldermen," and not in the freemen.

Even in the charter of the city of Newport (passed May, 1853, Acts and Resolves of May, 1853, p. 21–22), the only provision, which covers the appointment of police and their compensation, is as follows, from section 4: "The city council shall appoint all necessary officers, define the duties, and fix the compensation of officers, in cases where such duties, fees, and compensation shall not be defined and fixed by this charter *or the laws of the State.*"

Further references almost without number might be detailed to show how, in relation to various matters of public interest, though of local application, the General Assembly has assumed and exercised control, many of which are given in the opinion of Stiness, C. J., in the case of *Newport* v. *Horton, supra.*

That a municipal charter is subject at all times to such change, modification, or repeal as the legislature shall see fit to impose is not only fully set forth in many of the cases cited, *supra,* but is very convincingly and strongly stated in *Philadelphia* v. *Fox,* 64 Pa. St. 169, wherein, at p. 181, it decides as follows: "The sovereign may continue its corporate existence, and yet assume or resume the appointments of all its officers and agents into its own hands; for the power which can create and destroy can modify and change. Indeed, the legislature of this commonwealth, under the constitution, could not by contract invest any municipal corporation with an irrevocable franchise of government over any part of its territory. It cannot alienate any part of the legislative power which, by the constitution, is vested in a General Assembly annually convened: *Parker* v. *Com.* 6 Barr, 507. If the legislature were to attempt to erect a municipality with a special provision that

its charter should be unchangeable or irrevocable, such provision would be a nullity; for Acts of Parliament derogatory from the power of subsequent parliaments bind not: I Blacks. Com. 90.

"That such political institutions have not and can not have any vested rights as against the State, is strikingly illustrated and exemplified in *The Borough of Dunmore's Appeal*, 2 P. F. Smith, 374, where it was held by this court that municipal corporations, being creatures of legislation, have no constitutional guaranty of trial by jury, and such trial may be denied them."

It is needless to say, in view of all these matters, that the court in this instance does not find that the act in question is in violation of article IV, section 10, of the constitution; but, on the contrary, finds that this exercise of legislative power is well within the provisions of the constitution.

The respondents also claim, in their answer to the alternative writ, that the section of the act in question (§ 9, cap. 804, Pub. Laws) also infringes article 14, section 1, of the amendments to the constitution of the United States. We do not find that this position is insisted upon, either in the brief of the respondents, or in the argument before the court, nor do we find any case cited where it is held that such an act as this, which is here in question, is in any manner an infringement of the said provisions of the United States constitution. On the contrary, several of the cases above cited incidentally hold that such acts, being within the direct legislative control, under the constitutions of the several States, are not obnoxious to the provisions of article 14 of the amendments to the constitution of the United States.

See, in this connection, *Williams* v. *Eggleston*, 170 U. S. 304, 310; *Kelly* v. *Pittsburgh*, 104 U. S. 78, 81; *County of Mobile* v. *Kimball*, 102 U. S. 691; *State* v. *Williams*, 68 Conn. 131; *Giozza* v. *Tiernan*, 148 U. S. 662; *Powell* v. *Pennsylvania*, 127 U. S. 679, 683; *Henderson Bridge Co.* v. *Henderson City*, 173 U. S. 592.

*William B. Greenough, Attorney-General, and William P. Sheffield, Jr.*, for petitioners.

*J. Stacy Brown, City Solicitor*, for respondents.